[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 8, 2007
THOMAS K. KAHN
CLERK

No. 05-15890

D.C. Docket No. 05-00459-CV-AR-S

SLOSS INDUSTRIES CORPORATION,

Plaintiff-Appellee,

versus

EURISOL,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

**(June 8, 2007)**

Before CARNES and MARCUS, Circuit Judges, and JORDAN,[*] District Judge.

JORDAN, District Judge:

Sloss Industries Corporation, an Alabama company, manufactures and sells

_____

[*]Honorable Adalberto J. Jordan, United States District Judge for the Southern District of Florida, sitting by designation.

slag wool, a fibrous form of blast furnace slag that resembles asbestos and is used for insulation and similar applications.[1] Starting in mid-2004, Eurisol SARLy,[2] a French limited liability company, began placing orders with Sloss for slag wool. When Eurisol failed to pay for certain of the shipments, Sloss filed a federal lawsuit in the Northern District of Alabama against Eurisol and its managing director, Jean Claude Ferrarin. Eurisol and Mr. Ferrarin, despite having been served with process, did not timely appear or respond to Sloss' complaint. As a result, about six weeks after service was effected, the district court entered a default judgment against Eurisol and Mr. Ferrarin on liability, and set a trial on damages before a jury. Five weeks later, a jury awarded Sloss $324,551.82 in damages against Eurisol and Mr. Ferrarin.

A month or so following the jury verdict, Eurisol and Mr. Ferrarin filed a motion requesting that the judgment be set aside, arguing first (under Rule 60(b)(4)) that the district court lacked personal jurisdiction over them, and second (under Rule 60(b)(1)) that the default judgment on liability should be set aside due to excusable neglect. The district court denied the motion.

Eurisol and Mr. Ferrarin then filed a motion to alter, amend, or vacate the

---

[1] *See* 2 SHORTER OXFORD ENGLISH DICTIONARY 2864 (5th ed. 2002).

[2] SARL is the French abbreviation for a term used to describe a private company similar to an American limited liability company.

judgment. The district court granted the motion as to Mr. Ferrarin – finding that Sloss had not presented any viable theory as to how Mr. Ferrarin could be held individually liable for Sloss' breach of contract – but denied the motion as to Eurisol. Eurisol now appeals. We affirm, concluding that Eurisol was subject to specific personal jurisdiction in Alabama, and that the district court did not abuse its discretion in refusing to set aside the default judgment.

# I

Rule 60(b)(4) allows a litigant – even one who does not initially appear – to collaterally attack a judgment on the ground that it is void due to lack of personal jurisdiction. *See, e.g., Hazen Research, Inc. v. Omega Minerals, Inc.,* 497 F.2d 151, 154 (5th Cir. 1974). This is because "[a]n in personam judgment entered without personal jurisdiction over a defendant is void as to that defendant." *Combs v. Nick Garin Trucking,* 825 F.2d 437, 442 (D.C. Cir. 1987). *See also Burke v. Smith,* 252 F.3d 1260, 1263 (11th Cir. 2001) (generally a judgment is void if the district court lacked subject-matter jurisdiction, lacked personal jurisdiction over the parties, or acted inconsistent with due process). *Accord Jackson v. Fie Corp.,* 302 F.3d 515, 522-23 (5th Cir. 2002); *Thos. P. Gonzalez Corp. v. Consejo Nacional de Produccion de Costa Rica,* 614 F.2d 1247, 1255-56 (9th Cir. 1980).

The district court's determination that personal jurisdiction could

constitutionally be exercised over Eurisol is subject to plenary review. *See, e.g., McGow v. McCurry,* 412 F.3d 1207, 1214 n.2 (11th Cir. 2005). The fact that the district court was addressing Eurisol's Rule 60(b)(4) motion when it ruled on personal jurisdiction does not convert the standard of review into a more deferential one: "Unlike motions pursuant to other subsections of Rule 60(b), Rule 60(b)(4) motions leave no margin for consideration of the district court's discretion as the judgments themselves are by definition either legal nullities or not. Therefore, [w]e review de novo . . . a district court's ruling upon a Rule 60(b)(4) motion to set aside a judgment as void, because the question of the validity of a judgment is a legal one." *Burke,* 252 F.3d at 1263 (citations and quotation marks omitted).

## A

Personal jurisdiction generally entails a two-step inquiry. First, we determine whether the exercise of jurisdiction is appropriate under the forum state's long-arm statute. *See Sculptchair, Inc. v. Century Arts, Ltd.*, 94 F.3d 623, 626 (11th Cir. 1996). Second, we examine whether exercising jurisdiction over the defendant would violate the Due Process Clause of the Fourteenth Amendment, which requires that the defendant have minimum contacts with the forum state and that the exercise of jurisdiction not offend "traditional notions of fair play and substantial justice." *Id.* (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). In this case, the

4

two inquiries merge, because Alabama's long-arm statute permits the exercise of personal jurisdiction to the fullest extent constitutionally permissible. *See* Ala. R. Civ. P. 4.2(b); *Sieber v. Campbell*, 810 So. 2d 641, 644 (Ala. 2001).

Everyone agrees that this case involves only the concept of specific jurisdiction, that is, jurisdiction arising "out of a party's activities in the forum state that are related to the cause of action alleged in the complaint." *McGow,* 412 F.3d at 1214 n.3 (internal quotation marks omitted). In a case involving specific jurisdiction, a defendant's contacts with the forum state must satisfy three criteria: they "must be related to the plaintiff's cause of action or have given rise to it;" they must involve "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum;" and they "must be such that the defendant should reasonably anticipate being haled into court there." *Id.* at 1214.[3]

With these general concepts in mind, we turn to Eurisol's contacts with Alabama. Understanding that a minimum contacts analysis is "immune to solution by checklist," *Product Promotions, Inc. v. Cousteau,* 495 F.2d 483, 499 (5th Cir. 1974) (quotation marks omitted), and that contacts must be viewed both

---

[3] In contrast, general jurisdiction – jurisdiction not related to and not arising out of a defendant's contacts with the forum – can only be exercised if the defendant has "continuous and systematic" contacts with the forum. *See Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 415-16 (1984).

quantitatively and qualitatively, we discuss in detail the dealings between Eurisol and Sloss in 2004.[4]

**B**

Eurisol, as noted earlier, is a French company. It does not have any offices, officers, employees, or agents in Alabama. It does not own any real property in Alabama. It is not licensed or authorized to do business in Alabama, does not do business in Alabama, and does not have any customers in Alabama. It sells all of its goods in Europe. It does not solicit business in Alabama. Other than Sloss, it does not have any suppliers in Alabama.

On June 29, 2004, Eurisol sent an e-mail to Sloss asking for a price quote on a 40-foot container of slag wool to be delivered to France. The next day, Sloss sent Eurisol a ten-pound sample of slag wool, and provided Eurisol with the requested price quote. From July 5 to July 12, Eurisol and Sloss exchanged numerous e-mails and phone messages concerning matters such as Eurisol's opinion of the sample slag wool, the specifications and makeup of the slag wool Eurisol was looking for, the storage capacity of the shipping containers that would be used, the size of Sloss' bales of slag wool, the price of the slag wool, and the cost of shipping the containers to

---

[4] All of the communications summarized in the text were, of course, between employees or representatives of Sloss and Eurisol. But, for ease of reference, we use the names of the companies instead of the names of the individuals involved.

France.

Sloss approved Eurisol as a customer in July. On July 13, Eurisol placed an order with Sloss, by facsimile, for five containers of slag wool, consisting of about 52 bales per container. On that same day, Sloss and Eurisol sent each other e-mails concerning the payment terms initially proposed by Eurisol, and the companies ultimately agreed that Eurisol would make payment within 45 days of the date of the ocean bill of lading. On July 15, Eurisol, again by facsimile, placed an order for another five containers of slag wool. On July 20, Eurisol sent an e-mail to Sloss indicating that the initial orders of slag wool had not been received, and that Eurisol needed the wool so it could fulfill orders from its own customers. Two days later, Sloss responded by e-mail that it was working around the clock and delaying shipments to other customers in order to provide Eurisol with the slag wool it had ordered. In late July, Sloss and Eurisol exchanged more e-mails seeking to confirm how many containers Eurisol had ordered.

On August 13, Eurisol, by e-mail, informed Sloss that it would place another order the following week. Several days later, Eurisol, by facsimile, placed an order for another ten containers of slag wool. On August 20, Eurisol sent Sloss an e-mail concerning the first shipment of slag wool that it had received. According to Eurisol, the fiber was not regular in color, as some bales were darker than others, and the

fibers in the wool were too thin. Eurisol asked Sloss to see if it could "improve the quality, the color, and [the] thickness" of the fibers. Sloss responded that same day, by e-mail. Sloss indicated that it thought Eurisol used the slag wool for fireproofing, but inquired if there were other uses so it could produce the "best fiber" for Eurisol. In reply, again by e-mail, Eurisol said that it manufactured products for fireproofing and thermal insulation, and that it needed a "regular fiber (quality and color)" because it applied its products through spraying. As to quality, Eurisol indicated that it needed slag wool with resilience ("not short, not thin"). Eurisol also stated that Sloss might be using too little oil in the slag wool, and that, for its applications, it needed 0.2% of oil in the wool. Eurisol asked what Sloss was going to do to provide better a quality product.

Sloss, by e-mail on August 23, informed Eurisol that it could make the diameter of the fibers larger, and that the color of the slag wool would be white to light gray. Sloss also told Eurisol that it might be able to make the color lighter by adding gravel, but that Eurisol needed to make a "bigger commitment" to take a certain amount. As to the amount of oil being used, Sloss said it would find out and get back to Eurisol. Eurisol placed an order for 14 containers of slag wool, by facsimile, on August 23. The very next day, however, Eurisol complained to Sloss in an e-mail about the quality of the first five containers it had received, saying it was

8

"very disappointed" because the slag wool was irregular in color, and the fibers were shorter with very high density and "very breakable." Eurisol also told Sloss that it did not know if it would use the slag wool from the first five containers, and warned Sloss that if quality did not improve, it would not continue purchasing from Sloss. Later that day, Sloss responded by e-mail, suggesting that all shipments of slag wool stop until the problems could be resolved.

Despite these apparent problems, on August 30 Eurisol placed yet another order with Sloss for slag wool, requesting eight more containers.[5] Later that same day, Sloss sent an e-mail to Eurisol indicating that the new fiber it was making was thicker and better, and asking questions about a sample of slag wool that Eurisol had sent to Sloss. Eurisol next sent an e-mail to Sloss on the morning of September 3. In that e-mail, Eurisol said that it was trying to come up with a business plan for its dealings with Sloss and wanted to work with Sloss in "guaranteeing a certain amount of purchase." Eurisol also indicated that it was attempting, with Sloss, to "fix up" the quality issues. Finally, Eurisol requested that Sloss not sell its slag wool to Eurisol's competitors in Europe: "It would be very nice for us to know that Sloss . . . will not deliver to other[ ] industrial companies in Europe in our specific business (bales for spraying market). . . . Do you think it is possible?"

---

[5] Sloss alleged that Eurisol failed to pay for this order.

On the afternoon of September 3, Eurisol placed four more orders with Sloss by facsimile. These orders, respectively, were for 12, 16, 14, and 14 containers.[6] For the next seven days or so, Sloss and Eurisol exchanged e-mails and facsimiles about the recent orders placed by Eurisol and about a wire transfer for $25,690.50 that Eurisol had sent to Sloss' bank in Alabama. Sloss had been unable to locate the wire transfer at its bank, but ultimately realized that it had given the wrong bank information to Eurisol.[7]

Eurisol next contacted Sloss on September 13. In an e-mail, Eurisol informed Sloss that, in one of the containers it had received, all of the bales were wet and therefore unusable. Eurisol wanted to know what Sloss would do, and provided Sloss the container number, the bill of lading number, and the shipping date. Sloss responded that same day by e-mail, explaining that it did not load wet bales.

The next communication was on September 16. Sloss, by e-mail, told Eurisol that it was going to shut down production due to Hurricane Ivan, and that it was likely that no containers would be shipped the following week. The following day, Eurisol sent an e-mail to Sloss indicating that it had sent another wire transfer, this one for

---

[6] According to Sloss' complaint, Eurisol also failed to pay for these four orders.

[7] On September 15, Sloss sent an e-mail to Eurisol confirming that it had received Eurisol's wire transfer.

10

$27,904.80.[8]

On September 24, Mr. Ferrarin and his wife, Lorena Ferrarin (also a Eurisol employee), traveled to Birmingham, Alabama, to learn about Sloss' production process and to offer suggestions as to how to improve the slag wool. Mr. and Mrs. Ferrarin met with various Sloss employees and discussed the differences between the manufacturing processes of Sloss and Eurisol. They again requested that Sloss sell slag wool only to Eurisol in Europe, but Sloss would not agree to an exclusive relationship. They also discussed having Eurisol's agent in New York, Ocean World Lines ("OWL"), send containers to Sloss for shipment of the slag wool to France.[9] After lunch, Mr. and Mrs. Ferrarin toured Sloss' fiber manufacturing facility for about an hour. They were then taken to the airport for their flight home.

Following the Ferrarins' visit to Birmingham, Sloss and Eurisol exchanged facsimiles and e-mails concerning topics such as the delivery of containers by OWL, the price Eurisol was paying OWL for the containers, and the oil content in the slag wool. Then, on September 29, Sloss sent Eurisol an e-mail discussing various things

---

[8] By this time, there had also been various other phone conversations between Sloss and Eurisol.

[9] In six of the ten orders placed by Eurisol, OWL sent Sloss the containers to be loaded with slag wool. The containers were then sent by truck to Charleston, from where they were shipped to France.

that it was planning to do to make the slag wool more acceptable to Eurisol. Eurisol responded the next day, saying it would consider Sloss' proposal. Eurisol also inquired about two free containers of slag wool it had previously requested. A week later, on October 7, Sloss responded by e-mail, saying that it was "still working" on Eurisol's request for the two free containers, and inquiring whether Eurisol would need any more slag wool during the month. On October 8, Eurisol replied to Sloss by e-mail, indicating that it did not need more slag wool because it was having problems with Sloss' product, and suggesting again that Sloss send it the two free containers. Eurisol also told Sloss in that e-mail that it preferred that Sloss use 0.2% mineral oil instead of glycol, and that it would wait to see the quality of the next shipment before deciding whether to continue doing business with Sloss.

On October 18, Eurisol sent an e-mail to Sloss concerning the problems it said it was having with Sloss' slag wool. According to Eurisol, employees in its factory did not want to work with the wool because it was too "prickly and dusty," and three employees had already resigned. In addition, Eurisol said that its own customers were refusing to buy its product if it was made with Sloss' slag wool due to application problems caused by high density, and that spraying applications had been stopped by health officials due to the dangers posed by the dust from the wool. Eurisol further complained that it had been forced to take back about ten truck loads

on jobs that used Sloss' slag wool, and replace those orders with its own product. Eurisol closed by telling Sloss that its slag wool remained as "deplorable" as in the first shipments, and that it had (or would soon have) 700 tons of Sloss' slag wool in its factory, which it did not want to use.

Sloss responded to Eurisol by e-mail the same day. It denied most of Eurisol's allegations, and said that Eurisol had provided specifications only when the Ferrarins visited Birmingham in September. As to the amount of slag wool sitting in Eurisol's factory, Sloss said it was "not sure" what could be done about it, but suggested there might be something Eurisol could do "on [its] end" to make the product acceptable. Sloss told Eurisol that it could make the slag wool consistent with the discussions during the Birmingham meeting, and inquired when it could expect payment on the slag wool that had already been shipped.

A week later, on October 25, Eurisol replied to Sloss' e-mail. It rejected Sloss' explanation, and detailed how, in its view, it had repeatedly told Sloss of the various problems with the slag wool. Eurisol also claimed that it was not until the Ferrarins' visit to Birmingham that it had learned that Sloss was using glycol, and not oil, in the slag wool. Eurisol told Sloss that it refused to use the 700 tons of slag wool it had left over, and that this amount of product was at Sloss' disposal. Finally, Eurisol informed Sloss that it was stopping payments.

13

Following a phone conversation on November 2, Sloss sent an e-mail to Eurisol on November 8 indicating that it would try to sell the unused slag wool from Eurisol's factory. Sloss demanded, however, that Eurisol pay for the slag wool it had used. Eurisol responded by e-mail on December 6 that it had 719 tons of Sloss' slag wool, that the amount of the unpaid invoices was $294,840.50, that its own customer complaints amounted to $68,000 in losses, and that the freight it had paid for the unused shipments amounted to $79,000.

Eurisol proposed two "solutions." The first was that Sloss deduct the $68,000 and $79,000 from the unpaid balance of $294,840.50 and then "add a convenient compensation" to Eurisol at a sum to be agreed by the companies. The second was that Eurisol incorporate Sloss' slag wool into its own slag wool at a one to nine ratio, allowing it to get rid of the 719 tons of product in about six months. Under this second proposal, Sloss would give Eurisol a 50% credit, and Eurisol would pay the balance ($147,420.25) over the first four months of 2005.

Sloss apparently did not think much of Eurisol's proposals. In March of 2005, Sloss sued Eurisol and Mr. Ferrarin in the Northern District of Alabama.

## C

The district court concluded that Eurisol's contacts with Alabama, though "minimal," distinguished the case from a "mere purchaser" scenario, and were

14

sufficient to allow it to exercise personal jurisdiction. These contacts, said the district court, included Eurisol (1) initiating contact with Sloss, (2) having its representatives visit Sloss' manufacturing facilities in Alabama to discuss the production of the slag wool, (3) proposing an exclusive supplier arrangement, and (4) sending shipping containers to Sloss in Alabama for use in shipping the slag wool to France.

In asking us to reverse the district court's decision, Eurisol relies mainly on *Borg-Warner Acceptance Corp. v. Lovett & Tharpe, Inc.,* 786 F.2d 1055 (11th Cir. 1986), a case in which we held that personal jurisdiction did not exist with respect to an out-of-state purchaser of goods. Because of its importance to Eurisol's position, we discuss the case in detail.

Lovett & Tharpe, a Georgia corporation, contracted with Coon Manufacturing, a Missouri corporation, for Coon to manufacture certain merchandise that would be purchased by Lovett & Tharpe. All negotiations took place in Georgia, and no representative of Lovett & Tharpe visited Missouri to negotiate the contract or inspect Coon's manufacturing plant. Lovett & Tharpe executed a "trade acceptance" (a type of letter of credit) with Coon and Borg-Warner, an entity which then loaned money to Coon to finance the manufacturing of the merchandise. *See id.* at 1056 & n.1. Coon manufactured the merchandise in Missouri and shipped it to Lovett & Tharpe

15

in Georgia. Lovett & Tharpe subsequently returned some of the merchandise to Coon, and in connection with that return, some Lovett & Tharpe representatives traveled to Missouri. Borg-Warner sent the trade acceptance through normal banking channels for payment from Lovett & Tharpe's account at a Georgia bank, but Lovett & Tharpe refused to make payment or permit payment, and as a result the trade acceptance was returned unpaid. *See id.* at 1056. Borg-Warner then sued Lovett & Tharpe in Missouri. A Missouri court found that it had personal jurisdiction over Lovett & Tharpe, and issued a default judgment in favor of Borg-Warner for the full amount of the trade acceptance. When Borg-Warner brought a diversity action in the Southern District of Georgia to domesticate the judgment, Lovett & Tharpe asserted that the Missouri judgment was unenforceable because the Missouri courts lacked personal jurisdiction over it.

We ultimately concluded that the Missouri default judgment was void, and could not be domesticated in Georgia, because Lovett & Tharpe was not subject to suit in Missouri, not even under a specific jurisdiction theory. The three contacts asserted by Borg-Warner – the manufacturing of the merchandise in Missouri, the visit to Missouri by Lovett & Tharpe representatives in connection with the return of merchandise, and Borg-Warner's placement of the trade acceptance with a Missouri bank – were insufficient to satisfy the Due Process Clause. *See id.* at 1058. Relying

16

on *Owen of Georgia, Inc. v. Blitman,* 462 F.2d 603, 604 (5th Cir. 1972), we explained that "a mere one-time purchaser of goods from a seller in the forum state cannot be constitutionally subject to the exercise of personal jurisdiction by the courts of the forum state." *Borg-Warner,* 786 F.2d at 1059.[10]

The post-execution visit to Missouri by Lovett & Tharpe representatives was "jurisdictionally significant," *see id.* at 1058, but we found a Fifth Circuit decision, *Hydrokinetics, Inc. v. Alaska Mechanical, Inc.,* 700 F.2d 1026 (5th Cir. 1983), to be "persuasive precedent." *Borg-Warner,* 786 F.2d at 1061. In *Hydrokinetics,* the Fifth Circuit held that an Alaskan purchaser was not subject to personal jurisdiction in Texas even though, while contract negotiations were ongoing, two of its representatives visited and inspected the seller's equipment and facilities in Texas, and even though, after delivery of the goods, two of its representatives and its counsel went to Texas to discuss problems with the manufactured goods with the seller. *See Hydrokinetics,* 700 F.2d at 1029. The Fifth Circuit ruled that the purchaser's

---

[10]

We also indicated, by quoting favorably from an Eighth Circuit case, that non-resident purchasers are not treated the same as non-resident sellers for purposes of personal jurisdiction: "'Solicitation by a nonresident purchaser for delivery outside the forum state is a more minimal contact than that of a [nonresident] seller soliciting the right to ship goods into the forum state.'" *Borg-Warner,* 786 F.2d at 1059 (quoting *Scullin Steel Co. v. Nat'l Ry. Utilization Corp.,* 676 F.2d 309, 314 (8th Cir. 1982)). Dicta in an earlier Fifth Circuit decision, *Standard Fittings Co. v. Sapag, S.A.,* 625 F.2d 630, 639 n.18 (5th Cir. 1980), had suggested that "the distinction between buyers and sellers should be only one factor in the due process analysis, a factor which may have a bearing on the quality of the defendant's contact with the forum."

agreement to purchase goods made in Texas, and to make payment for the goods in Texas, did not show that the purchaser purposefully availed itself of the privilege of conducting business in Texas. *See id.* It also concluded that the exchange of communications between the parties (by telex, telephone, and letter) was insufficient to show purposeful activity invoking the benefits of Texas' laws, and that the two visits to Texas by the purchaser's representatives did not alter the "basic quality and nature of [the purchaser's] contact" with Texas. *Id.* Even though the agreement between the parties was "cemented" in Texas, where the purchaser's offer was accepted, the significance of that factor was "diminished" due to a contractual provision indicating that the agreement was to be governed by the law of Alaska. *Id.* Significantly, the Fifth Circuit emphasized in *Hydrokinetics* that the case did *not* "involve a repeated series of transactions," but rather a single one. *See id.* at 1030.

Another case that appears to support Eurisol's position is *Banton Industries, Inc. v. Dimatic Die & Tool Co.,* 801 F.2d 1283 (11th Cir. 1986). In *Banton*, Dimatic, a non-resident manufacturer, sold several thousand pulleys to Banton, an Alabama company. Prior to this particular sale, the parties had conducted transactions in the same way for a period of four years. Banton alleged that the pulleys were defective, and sued Dimatic in Alabama for breach of warranty. *See id.* at 1284. A divided panel held that the exercise of personal jurisdiction over Dimatic in Alabama would

violate the Due Process Clause. Notwithstanding the years of business dealings between the parties, the majority reasoned that Dimatic did not do business in Alabama (other than its sales to Banton), that Banton made an unsolicited order for the pulleys, that the pulleys were delivered to Banton in Nebraska, and that none of Dimatic's representatives entered Alabama. *See id.* at 1284-85. *See also Sea-Lift, Inc. v. Refinadora Costarricense de Petroleo, S.A.,* 792 F.2d 989, 993-94 (11th Cir. 1986) (Costa Rican corporation, which went to Florida to solicit Florida company for salvage of barge which had capsized off coast of Costa Rica, and which entered into standard "no cure - no pay" salvage contract that was accepted by company in Florida – but was governed by English law – was not subject to personal jurisdiction in Florida in suit alleging breach of salvage contract).

*Borg-Warner* and *Banton* are certainly favorable cases for Eurisol, but they do not carry the day because they are distinguishable on their facts. Unlike the one-time transaction at issue in *Borg-Warner,* this case involves ten orders placed by Eurisol over a period of several months. Admittedly, *Banton* cannot be distinguished on this ground because in that case the parties had a four-year history of business dealings. But there are other important differences between this case and *Borg-Warner* and *Banton*. After Eurisol placed various orders for slag wool, and after some shipments were delivered, the Ferrarins visited Sloss' plant in Alabama on behalf of Eurisol.

19

Unlike the representatives of Lovett & Tharpe in *Borg-Warner*, the Ferrarins did not travel to Alabama simply to return merchandise. Instead, while visiting Sloss' plant, the Ferrarins discussed Sloss' manufacturing process and ways to improve the quality of the slag wool, and proposed (for the second time) that Sloss enter into an exclusive relationship with Eurisol in the European market. Moreover, at one point Eurisol sent a sample of slag wool to Sloss. Finally, unlike the non-resident defendants in *Borg-Warner* and *Banton*, Eurisol was involved in the shipment process. For six of the ten orders it placed, Eurisol had its agent, OWL, send containers into Alabama so that Sloss could use them to ship the slag wool to France. In light of these differences, *Borg-Warner* and *Banton* do not control. Instead, other more analogous cases decided before *Borg-Warner* and *Banton* convince us that Eurisol could constitutionally be sued for breach of contract in Alabama.

We begin with *Hazen Research, Inc. v. Omega Minerals, Inc.,* 497 F.2d 151 (5th Cir. 1974), where an Alabama mining company, Omega, contracted with a Colorado company, Hazen, to develop extraction techniques for graphite deposits. An Omega representative went to Colorado and chose Hazen to do the work. For two to three years Omega "shipped books, records, and more than 40 tons of ore, virtually the entire production of its Alabama property, to Hazen in Colorado for use in testing." *Id.* at 155. Omega made payments to Hazen in Colorado, and on at least one

20

other occasion, an Omega representative met with Hazen's personnel at a test site in Colorado. *See id.* Omega failed to make certain payments, so Hazen sued Omega in Colorado and obtained a default judgment. When Hazen sought to enforce the judgment in Alabama, Omega argued that it was not subject to jurisdiction in Colorado and that, as a result, the Colorado judgment was void. We disagreed, and held that the exercise of jurisdiction over Omega in Colorado did not offend the Due Process Clause: "[Omega's] constitutional objection to Colorado's assertion of *in personam* jurisdiction is little more than frivolous. . . . The record in this case abounds with evidence of Omega's affirmative, purposeful decision to enter Colorado and conduct business there. This deliberate contact conferred on the courts of Colorado the constitutional authority to referee any bouts which resulted." *Id.* at 155-56 (citing *Product Promotions, Inc. v. Cousteau,* 495 F.2d 483 (5th Cir. 1974)). We acknowledge that *Hazen Research* is not directly on point because Eurisol did not send any raw materials to Alabama for the manufacturing of the slag wool. But in all other respects, the facts in *Hazen Research* are very close to those here.

Also instructive is *Southwest Offset, Inc. v. Hudco Publishing Co.,* 622 F.2d 149 (5th Cir. 1980) (per curiam). That case involved an Alabama publisher which was sued in Texas by a Texas printer with respect to a series of contracts for the printing of telephone directories. We held that the district court in Texas could

21

constitutionally exercise personal jurisdiction over the Alabama publisher for a number of reasons. First, even though the Texas printer solicited the initial order from the Alabama publisher, the publisher placed another eight orders in writing or over the phone. Second, although no representative of the publisher visited Texas, the publisher mailed to the printer in Texas camera-ready copies of its telephone directories, and, after it received proofs of the directories from the printer, returned corrected proofs to the printer in Texas. Third, all of the directories were printed in Texas, and the publisher mailed some payments to Texas. Fourth, Texas law governed the parties' contracts. *See id.* at 150, 151-52. Like the publisher in *Hudco Publishing,* Eurisol placed a number of orders and sent a sample of its own slag wool to Sloss. Eurisol's other contacts with Alabama went beyond those of the publisher in *Hudco Publishing.* Eurisol placed unsolicited orders for the slag wool, and its representatives (the Ferrarins) visited Alabama, where they inspected Sloss' plant, discussed the manufacturing process, and again asked Sloss to enter into an exclusive relationship in the European market.

Finally, we note the similarity between Eurisol's contacts and the forum contacts of one of the non-resident purchasers in *Whittaker Corp. v. United Aircraft Corp.,* 482 F.2d 1079 (1st Cir. 1973), a case we discussed with approval in *Borg-Warner,* 786 F.2d at 1061 & n.3. In *Whittaker,* the First Circuit held that personal

jurisdiction could be exercised in Massachusetts over United, a non-resident purchaser, in a suit brought by Whittaker, a Massachusetts manufacturer. There had been a prior five-year course of dealing, and United solicited Whittaker (though in places other than Massachusetts) to try to become a qualified participant in a process developed by United. United's representatives had visited Whittaker's facility five times while the product was being tested for use in the process, and had sent 16 documents and 20 teletype and phone messages into Massachusetts. United, moreover, had allegedly made misrepresentations to Whittaker in Massachusetts. *See Whittaker,* 482 F.2d at 1082-84. The First Circuit explained that, "[o]n this background," United's participation "seems clearly to rise above that of a purchaser who simply places an order and sits by until the goods are delivered." *Id.* at 1084.

In our view, Eurisol was more than a mere passive purchaser, and the exercise of specific jurisdiction by the district court did not offend the Due Process Clause. Not only did Eurisol place ten unsolicited orders during a period of time spanning several months, thereby establishing a course of dealing, for six of the orders it had its agent, OWL, send containers to Sloss in Alabama for use in shipment of the slag wool to France. The Ferrarins also visited Sloss' plant in Alabama on behalf of Eurisol, and while there they discussed the manufacturing process and proposed (for

the second time) that Sloss enter into an exclusive arrangement for the European market. And, as noted earlier, Eurisol sent Sloss a sample of its own slag wool. Given these facts, Eurisol purposefully availed itself of the privilege of conducting activities in Alabama, and reasonably could have anticipated being sued there. *See McGow,* 412 F.3d at 1214. *See also Pro Axess, Inc. v. Orlux Distribution, Inc.,* 428 F.3d 1270, 1277-78 (10th Cir. 2005) (French purchaser had sufficient minimum contacts with Utah and could be sued there under specific jurisdiction theory because (1) it solicited Utah manufacturer, (2) the contract required a continuing relationship, (3) the services necessary for the contract were to be performed in Utah, and (4) there were direct communications between French purchaser and Utah manufacturer). To the extent that *Hazen Research* and *Hudco Publishing* are inconsistent with *Borg-Warner* and *Banton,* we follow the former instead of the latter because they were decided first. *See, e.g., Swann v. Southern Health Partners, Inc.,* 388 F.3d 834, 837 (11th Cir. 2004) (explaining "prior panel" rule).

**D**

Having concluded that Eurisol had sufficient minimum contacts with Alabama, we must now decide whether the exercise of specific jurisdiction would offend traditional notions of fair play and substantial justice. *See Robinson v. Giarmarco & Bill, P.C.,* 74 F.3d 253, 259 (11th Cir. 1996). The relevant factors, as adapted to the

dispute in this case, are the burden on Eurisol, Alabama's interest in adjudicating the dispute, Sloss' interest in obtaining convenient and effective relief, the interests of the judicial systems of the United States and France in obtaining the most effective resolution, and the shared interests of the United States and France in furthering fundamental substantive policies. *See Asahi Metal Indus. Co. Ltd. v. Superior Court,* 480 U.S. 102, 113-15 (1987); *McGow,* 412 F.3d at 1215-16. This is essentially a reasonableness inquiry, *see Asahi Metal,* 480 U.S. at 113-14, and we conclude that due process concerns are satisfied.

Starting with the obvious, there are only two places where a contractual dispute between Sloss and Eurisol as to the slag wool could be adjudicated: Alabama and France. Alabama is, of course, the most convenient forum for Sloss. It is certainly inconvenient for Eurisol to defend a suit in Alabama, but it would be just as difficult for Sloss to have to litigate in France, as neither company does business in, or has a physical presence in, the other jurisdiction. *See id.* at 114. The burdens placed on Eurisol, moreover, would be lessened by the available methods of foreign transportation and communication, *see Mutual Service Ins. Co. v. Frit Indus., Inc.,* 358 F.3d 1312, 1320 (11th Cir. 2004), and by the fact that, if Eurisol filed a counterclaim or interposed a defense based on purported defects in the slag wool – as it said it would in its motion to set aside the default – Sloss would have to travel

25

to France to do some discovery and inspect the tons of product that Eurisol rejected.

Both Alabama and France have a legitimate interest in adjudicating a dispute between their respective citizens, but given the production of the slag wool in Alabama and the visit of the Ferrarins to Sloss' plant, it is not constitutionally unreasonable to hale Eurisol into federal court in Alabama. It is at least plausible that Alabama law would apply to Sloss' breach of contract claim because Sloss accepted each order in Alabama and because Eurisol's payments were due in Alabama. A federal court in Alabama, it seems to us, would be better equipped than a French court to handle a breach of contract claim arising under Alabama law.

## II

The next issue is whether the district court erred in denying Eurisol's Rule 60(b)(1) motion to set aside the default judgment on the basis of excusable neglect. The determination of what constitutes excusable neglect is generally an equitable one, taking into account the totality of the circumstances surrounding the party's omission. *See, e.g., Pioneer Inv. Services Co. v. Brunswick Assoc. Ltd. Partnership,* 507 U.S. 380, 389, 395 (1993) (discussing excusable neglect under Bankruptcy Rule 9006(b)(1)). In order to have the default judgment set aside, Eurisol must show that it had a meritorious defense, that Sloss would not be prejudiced if the judgment were

set aside, and that it had a "good reason" for failing to respond to Sloss' complaint. *See In re Worldwide Web Systems, Inc. v. Feltman,* 328 F.3d 1291, 1295 (11th Cir. 2003). Although there is a "strong policy of determining cases on their merits," *id.*, we review the district court's decision only for abuse of discretion, *see, e.g., Gibbs v. Air Canada,* 810 F.2d 1529, 1537 (11th Cir. 1987), which means that the district court had a "range of choice" and that we cannot reverse just because we might have come to a different conclusion had it been our call to make. *See United States v. Frazier,* 387 F.3d 1244, 1259 (11th Cir. 2004) (*en banc*).

We conclude that Eurisol did not show a good reason for failing to respond to Sloss' complaint. The district court therefore did not abuse its discretion in refusing to set aside the default judgment.

Eurisol, which does not have any in-house attorneys, was served with process through the Hague Convention on April 6, 2005. Three or four days later, Eurisol forwarded the complaint to Jean Bertrand, a French attorney who was representing Eurisol and Mr. Ferrarin as outside counsel.

Mr. Ferrarin and Mr. Bertrand discussed whether Eurisol should challenge the jurisdiction of the court in Alabama or file a counterclaim in the lawsuit. Although Mr. Bertrand doubted that Eurisol had to respond to the complaint – he believed that proper jurisdiction existed only in France, where the goods were delivered – "after

27

a time of consideration" of unspecified length, Eurisol instructed him to hire an attorney to represent it (and Mr. Ferrarin) in Sloss' lawsuit. Mr. Bertrand said he began looking for an Alabama lawyer, but was unsuccessful, though he did not indicate when his search for counsel began. Despite his lack of success, he "did not feel a sense of urgency to respond" to Sloss' complaint because he still had doubts about whether Sloss could sue in Alabama and because the rules for responding to a complaint are different in France (so that, according to Mr. Bertrand, it takes from four months to a year (and sometimes more) for a responsive pleading to be filed). Eventually – it is unclear when – Mr. Bertrand contacted an attorney at Carlton Fields in Orlando, Florida, who agreed to help him find an attorney in Alabama. The problems in retaining counsel, however, still persisted. The first Alabama firm contacted, Maynard Cooper & Gale, had a conflict of interest. So did the second firm, Bradley, Arant, Rose, & White. Mr. Bertrand was finally able to retain Balch & Bingham, but by then the default judgment had already been entered. According to Mr. Bertrand, Eurisol did not know about the delay in obtaining Alabama counsel until after the default judgment had been entered.

One may wonder why there are no dates in the preceding paragraph. After all, time matters when one seeks to set aside a default, and in analyzing whether a defaulting defendant has shown good reason for failing to timely respond, it is

28

important to know exactly when certain actions were taken, and what delays existed before or after those actions. The reason there are no dates is that the affidavits of Mr. Ferrarin and Mr. Bertrand are utterly devoid of chronological specificity. The affidavits do not say when Eurisol instructed Mr. Bertrand to retain Alabama counsel, or when Mr. Bertrand first began looking for an Alabama lawyer, or when Mr. Bertrand contacted Carlton Fields in Orlando, or when Mr. Bertrand or Carlton Fields made contact with the first two Alabama firms, or when those firms disclosed that they had conflicts of interest. The affidavits of Mr. Ferrarin and Mr. Bertrand are also silent as to whether anyone, at any time, checked the docket sheet in the Alabama district court to find out what (if anything) was going on with the lawsuit and, if so, how Eurisol reacted (if at all) to the information gleaned from the court file. In other words, the affidavits say nothing about when Eurisol or its counsel learned about the initial default judgment on liability or the final default judgment.

This lack of detail is, in our view, fatal to Eurisol's Rule 60(b)(1) motion. We recognize that Eurisol is a foreign defendant, but it moved to set aside the default judgment on July 28, 2005, over three and a half months after it was served with process, and over one month after the default judgment was entered. The longer a defendant – even a foreign defendant – delays in responding to a complaint, the more compelling the reason it must provide for its inaction when it seeks to set aside

29

a default judgment. The affidavits Eurisol submitted, given the delay here, were simply insufficient. *Cf. Worldwide Web Systems,* 328 F.3d at 1297-98 (defendant who, after learning of default judgment, waited almost two months to move to set aside judgment, did not demonstrate "good reason" under Rule 60(b)(1)).

Our Rule 60(b)(1) cases have consistently held that where internal procedural safeguards are missing, a defendant does not have a "good reason" for failing to respond to a complaint. *See, e.g., Gibbs,* 810 F.2d at 1531, 1537-38 (defendant's manager left message for solicitor in legal department and sent copy of complaint to him, message was not returned, complaint was not received, default judgment was entered eight months later, and defendant moved to set aside judgment two months afterwards); *Davis v. Safeway Stores, Inc.,* 532 F.2d 489, 490 (5th Cir. 1975) (per curiam) (defendant promptly sent copy of complaint to insurer, insurer did not retain counsel or respond to complaint, there were no communications between defendant and insurer for about three weeks, and default judgment was entered just four weeks after answer was due). *Cf. Baez v. S.S. Kresge Co.,* 518 F.2d 349, 350 (5th Cir. 1975) (per curiam) (Rule 60(b)(6) case) (due to postal error, local counsel did not receive complaint from defendant's home office, and default judgment was entered). We have extended this principle to situations where a defendant, knowing that an action has been filed against him, fails to act diligently in ensuring that his attorney is

adequately protecting his interests. *See Florida Physician's Ins. Co., Inc. v. Ehlers,* 8 F.3d 780, 784 (11th Cir. 1993) (per curiam).

Eurisol fares no better than the unsuccessful defendants in the cases cited above. First, as noted earlier, the affidavits of Mr. Ferrarin and Mr. Bertrand are not specific enough as to what happened during the three and a half months in question. Second, during this period of time, Eurisol failed to check with Mr. Bertrand to ensure that someone had been retained to respond to Sloss' lawsuit, and did not have any procedures in place to make sure that its interests were being protected. Under the circumstances, Eurisol cannot simply shift the blame to Mr. Bertrand, its French attorney, and thereby obtain relief from the default judgment.

## III

The district court properly exercised specific personal jurisdiction over Eurisol, and did not abuse its discretion in refusing to set aside the default judgment.

**AFFIRMED.**