[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 08-14782

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JANUARY 13, 2010
JOHN LEY
ACTING CLERK

D. C. Docket No. 07-00042-CV-WTM-4

DIAMOND CRYSTAL BRANDS, INC.,
DIAMOND CRYSTAL SALES, LLC.,

Plaintiffs-Counter-
Defendants-Appellees,

versus

FOOD MOVERS INTERNATIONAL, INC.,

Defendant-Counter-
Claimant-Appellant,

HORMEL FOODS CORPORATION,

Counter-Defendant.

_____

Appeal from the United States District Court
for the Southern District of Georgia

_____

(January 13, 2010)

Before TJOFLAT, ANDERSON and STAPLETON,[*] Circuit Judges.

TJOFLAT, Circuit Judge:

This challenge to the district court's exercise of personal jurisdiction over a nonresident defendant gives us occasion to revisit our jurisprudence regarding the Georgia Long-Arm Statute, O.C.G.A. § 9-10-91 (the "long-arm statute"), in light of recent pronouncements by the Georgia Supreme Court. Whereas we have previously understood the Georgia long-arm jurisdictional analysis to merge into a single, coextensive procedural due process analysis, the Georgia Supreme Court has since made clear the independent importance of the statute. In <u>Innovative Clinical & Consulting Servs., LLC v. First Nat'l Bank of Ames, Iowa</u>, 620 S.E.2d 352, 355–56 (Ga. 2005), the Georgia Supreme Court held that a trial court must engage in a separate, literal application of the Georgia long-arm statute in addition to a due process inquiry in deciding whether personal jurisdiction exists over a nonresident defendant. We now conform the rule in this circuit to the state law as announced by the Georgia Supreme Court. Additionally, we conclude that although the district court may have erred in its analysis under this newly clarified standard, jurisdiction is proper under both the long-arm statute and the Due Process Clause of the Fourteenth Amendment. We affirm.

---

[*] Honorable Walter K. Stapleton, United States Circuit Judge for the Third Circuit, sitting by designation.

I.

This action was brought by Diamond Crystal Brands, Inc. and Diamond

Crystal Sales, LLC (collectively "Diamond Crystal") against Food Movers

International, Inc. ("Food Movers") alleging nonpayment for two shipments of

Splenda Brand sweetener ("Splenda"). Diamond Crystal Brands, Inc., an

international seller of sugar and other sweetening products, is a Delaware

corporation that maintains a facility in Savannah, Georgia. Diamond Crystal Sales,

LLC is a Delaware limited liability sales company qualified to do business in

Georgia and is under common ownership with Diamond Crystal Brands. Food

Movers is a food distribution company that purchases bulk food products from

manufacturers for immediate resale to retail and other distributor customers. It is a

California corporation with its sole place of business in Benicia, California. Food

Movers has no offices, distribution centers, or personnel outside the state of

California, and its employees do not travel outside of California to conduct

business.[1]

---

[1] Diamond Crystal alleged in its complaint that Food Movers "maintains an ongoing business presence in Georgia through a regional distribution center in Georgia." Food Movers specifically denied this assertion in an affidavit, filed with its motion to dismiss, from its president, Anthony LaMonica. Diamond Crystal attempted to bolster its allegation with an affidavit, filed with its opposition to Food Movers's motion to dismiss, from Scott Seibel, a region sales manager for Diamond Crystal Brands, in which Seibel testified that "Thomas LaMonica, Food Movers International's general manager, gave me a map of the United States that was broken down into geographic regions. . . . Mr. LaMonica told me that the distribution centers shown on the map were distribution centers with which he had done business in the

Food Movers's business model is to purchase products from manufacturers, with the purchases sometimes being facilitated by outside food brokers, and then to quickly resell the products, usually before even taking delivery from the manufacturer, to its customers. Its customers then arrange for and accept delivery from the manufacturer and resell the products to their own customers or to the public.

In this case, Diamond Crystal's sales to Food Movers were facilitated by Nasser Company, Inc. ("Nasser"), a California-based food broker that markets Diamond Crystal's products. Nasser first solicited the sales to Food Movers, and Nasser and Diamond Crystal Brands's California-based region sales manager, Scott Seibel, traveled to Food Movers's office in California to negotiate the terms of the sales. All of the negotiations took place either in person at Food Movers's office in California or through telephone conversations between Food Movers and

_____

past." The map attached to the Seibel affidavit indicated one such distribution center in Atlanta, Georgia. With its reply in support of its motion to dismiss, Food Movers submitted the affidavit of its vice president of sales, Thomas LaMonica, which stated that Food Movers does not have a distribution center in Georgia, has never done business with any distribution center in Georgia, and has no distributor agreements in Georgia. Regardless of whether the district court properly received this latter evidence for consideration, Diamond Crystal's allegation and evidence do not establish that Food Movers itself maintained a distribution center in Georgia, but only that it may have done business in the past with a distributor in Georgia. Nor does this evidence indicate the volume of business Food Movers may have done with a Georgia distribution center or when it conducted such business. Moreover, Diamond Crystal has not shown how any such prior relationship between Food Movers and a distribution center in Atlanta has anything to do with the transactions at issue in this case.

4

Nasser or Seibel, all of whom were in California.

As a result of these discussions, Food Movers submitted purchase orders to Nasser in California for the purchase of Diamond Crystal products. In all, from August 2005 to January 2006, Food Movers ordered bulk Splenda from Diamond Crystal, through Nasser, in fourteen transactions totaling more than $1.9 million. Diamond Crystal alleges that Food Movers failed to pay for two of these shipments, relating to purchases made on January 13 and 18, 2006, and therefore owes Diamond Crystal $288,111.60 plus prejudgment interest.

The terms and mechanics of the purchases included the following. Food Movers submitted its purchase orders to Nasser in California. Immediately thereafter, Food Movers resold the product to its own third-party customers. Diamond Crystal and Food Movers agreed that Diamond Crystal would tender the product F.O.B. Savannah,[2] at its plant.[3] Diamond Crystal also invoiced Food

---

[2] Georgia's enactment of the Uniform Commercial Code provides,

Unless otherwise agreed the term F.O.B. (which means "free on board") at a named place, even though used only in connection with the stated price, is a delivery term under which:

(a) When the term is F.O.B. the place of shipment, the seller must at that place ship the goods in the manner provided in this article (Code Section 11-2-504) and bear the expense and risk of putting them into the possession of the carrier; or

(b) When the term is F.O.B. the place of destination, the seller must at his own expense and risk transport the goods to that place and there tender delivery of them in the manner provided in this article (Code Section

Movers from its Savannah facility. Although the purchase orders specified "[c]ustomer pickup" and the bills of lading recorded delivery as having been taken "buy buyers [sic] truck," Food Movers offered affidavit evidence that its personnel did not actually take delivery of the product from Diamond Crystal.[4] Instead, as the product had been resold to third-party customers of Food Movers by the time of tender by Diamond Crystal, those third-party customers took delivery of the product directly from Diamond Crystal. Accordingly, Food Movers never picked up the Splenda in Georgia. It did, however, send payments (for the shipments for which it paid), drawn on its California bank, by mail or wire transfer to Diamond Crystal in Georgia.

On February 28, 2007, Diamond Crystal filed this lawsuit, seeking the

---

11-2-503) . . . ;

O.C.G.A. § 11-2-319(1). In other words, the use of the term "F.O.B. Savannah" in this case means that Diamond Crystal had the obligation to tender the product at its plant in Savannah and bore the risk of loss for the product until it was tendered.

[3] The parties sharply contest how the F.O.B. Savannah term came into being. Diamond Crystal asserts that it initially offered the product F.O.B. Visalia, California and claims that Food Movers requested that the terms be changed to F.O.B. Savannah (presumably to avoid the time and expense of shipping product ultimately destined for later distribution in the Southeast across the country twice). In contrast, Food Movers maintains that Seibel, the Diamond Crystal representative, insisted that delivery would be required at the Savannah plant due to the volume of product involved and that Diamond Crystal never offered an F.O.B. California option.

[4] Food Movers maintains that these references are to its third-party customers, who were the "customer[s]" and "buyers" responsible for hiring carriers and picking up the product from Diamond Crystal for their own purposes.

6

$288,111.60 Food Movers failed to pay, in the Superior Court of Chatham County, Georgia. Food Movers removed the action, on the basis of diversity jurisdiction, to the United States District Court for the Southern District of Georgia on March 22, 2007. On April 6, 2007, Food Movers moved to dismiss Diamond Crystal's complaint pursuant to Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction and submitted affidavit evidence in support of its challenge to the court's jurisdiction. After full briefing, including the submission of counter-affidavits by Diamond Crystal, the district court denied the motion on August 3, 2007.

Food Movers subsequently answered the complaint, preserving its objection to personal jurisdiction and asserting counterclaims against Diamond Crystal for breach of contract, tortious and bad faith breach of contract, unfair trade practices, and deceptive trade practices in connection with Diamond Crystal and related companies' decisions to stop selling Splenda and other products to Food Movers.[5]

---

[5] We reject, with minimal discussion, Diamond Crystal's argument that Food Movers waived its defense of lack of personal jurisdiction by asserting its counterclaims. Food Movers filed its answer, which preserved its personal jurisdiction defense, and counterclaims only after the district court denied the motion to dismiss for lack of personal jurisdiction. See Fulghum Indus., Inc. v. Walterboro Forest Prods., Inc., 345 F. Supp. 296, 299 (S.D. Ga. 1972) (rejecting the argument that defendant waived jurisdiction as a result of filing defenses and a counterclaim because "[g]enerally, a waiver results only when a defendant pleads to the merits without excepting to the jurisdiction of the court"), aff'd, 477 F.2d 910, 911 (5th Cir. 1973). In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

Food Movers later filed an amended answer and counterclaims asserting claims against Diamond Crystal for breach of contract and against Diamond Crystal and its corporate parent for "Unfair, Unlawful, Discriminatory, and Anti-Competitive Business Practices" in violation of California unfair competition and antitrust law and federal antitrust law. Food Movers admitted that it withheld payment on two of the Splenda purchase orders but denied that it owed Diamond Crystal any money due to Diamond Crystal's alleged conduct implicated in the counterclaims.

On June 20, 2008, the district court granted Diamond Crystal judgment on the pleadings for its complaint and entered judgment on that order the same day. It stayed enforcement of its judgment, however, pursuant to Federal Rule of Civil Procedure 62(h), pending the resolution of Food Movers's counterclaims. On July 21, 2008, the district court granted Diamond Crystal's motion for summary judgment on Food Movers's counterclaims and lifted the stay of its June 20, 2008, judgment. The court entered final judgment pursuant to its July 21 summary judgment order on September 10, 2008. Food Movers now appeals the district court's denial of its motion to dismiss for lack of personal jurisdiction.[6]

---

[6] Food Movers filed its notice of appeal, which also purported to include all subsequent orders of the district court through the entry of final judgment directed in the court's July 21, 2008, summary judgment order, on August 20, 2008. We treat the notice of appeal as if it were filed on September 10, 2008—the date the district court actually entered final judgment—by operation of Fed. R. App. P. 4(a)(2). As the parties have only briefed and argued the issue of personal jurisdiction, that is the only issue we address.

II.

"We have consistently held that the issue of whether personal jurisdiction is present is a question of law and subject to <u>de novo</u> review." <u>Oldfield v. Pueblo De Bahia Lora, S.A.</u>, 558 F.3d 1210, 1217 (11th Cir. 2009).

"A plaintiff seeking the exercise of personal jurisdiction over a nonresident defendant bears the initial burden of alleging in the complaint sufficient facts to make out a prima facie case of jurisdiction." <u>United Techs. Corp. v. Mazer</u>, 556 F.3d 1260, 1274 (11th Cir. 2009). "Where, as here, the defendant challenges jurisdiction by submitting affidavit evidence in support of its position, 'the burden traditionally shifts back to the plaintiff to produce evidence supporting jurisdiction.'" <u>Id.</u> (quoting <u>Meier ex rel. Meier v. Sun Int'l Hotels, Ltd.</u>, 288 F.3d 1264, 1269 (11th Cir. 2002)); <u>see also</u> <u>Polskie Linie Oceaniczne v. Seasafe Transport A/S</u>, 795 F.2d 968, 972 (11th Cir. 1986) (noting that, if the defendant makes a showing of the inapplicability of the long-arm statute, "the plaintiff is required to substantiate the jurisdictional allegations in the complaint by affidavits or other competent proof, and not merely reiterate the factual allegations in the complaint"). "Where the plaintiff's complaint and supporting evidence conflict with the defendant's affidavits, the court must construe all reasonable inferences in

9

favor of the plaintiff." Meier, 288 F.3d at 1269.

III.

A.

"A federal court sitting in diversity undertakes a two-step inquiry in determining whether personal jurisdiction exists: the exercise of jurisdiction must (1) be appropriate under the state long-arm statute and (2) not violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution." United Techs. Corp. v. Mazer, 556 F.3d 1260, 1274 (11th Cir. 2009). "When a federal court uses a state long-arm statute, because the extent of the statute is governed by state law, the federal court is required to construe it as would the state's supreme court." Lockard v. Equifax, Inc., 163 F.3d 1259, 1265 (11th Cir. 1998). Therefore, we must interpret and apply Georgia's long-arm statute in the same way as would the Georgia Supreme Court.

As pertinent to this case, the Georgia long-arm statute provides:

A court of this state may exercise personal jurisdiction over any nonresident or his executor or administrator, as to a cause of action arising from any of the acts, omissions, ownership, use, or possession enumerated in this Code section, in the same manner as if he were a resident of the state, if in person or through an agent, he:

(1) Transacts any business within this state;

O.C.G.A. § 9-10-91(1). For many years, our court has followed the interpretation

10

that "Georgia's long arm statute confers in personam jurisdiction to the maximum

extent allowed by the due process clause of the federal Constitution." Francosteel

Corp. v. M/V Charm, 19 F.3d 624, 627 (11th Cir. 1994).[7] Under this rule, courts in

this circuit have even gone so far as to pass over the long-arm analysis entirely and

conflate it with, or collapse it into, the due process inquiry.[8]

---

[7] See also, e.g., McGow v. McCurry, 412 F.3d 1207, 1214 (11th Cir. 2005); Club Car, Inc. v. Club Car (Quebec) Import, Inc., 362 F.3d 775, 784 (11th Cir. 2004); Nippon Credit Bank, Ltd. v. Matthews, 291 F.3d 738, 746 (11th Cir. 2002) (per curiam); Complete Concepts, Ltd. v. Gen. Handbag Corp., 880 F.2d 382, 388 (11th Cir. 1989) (per curiam) ("Both the former Fifth Circuit Court of Appeals and this circuit have observed that this section is coterminous with due process."); Southwire Co. v. Trans-World Metals & Co. Ltd., 735 F.2d 440, 445 (11th Cir. 1984); cf. Gold Kist, Inc. v. Baskin-Robbins Ice Cream Co., 623 F.2d 375, 378–79 (5th Cir. 1980) (noting statements of Georgia courts suggesting that the long-arm statute is coextensive with due process, but holding that the facts of the case did not require a finding that the long-arm statute reached the limits of due process).

[8] See, e.g., Vermeulen v. Renault, U.S.A. Inc., 965 F.2d 1014, 1021 (11th Cir. 1992) ("When the courts of the forum State have interpreted the forum's long-arm statute to confer jurisdiction to the limits allowed by federal due process, state law need not be applied: we need only ask whether the exercise of jurisdiction over the nonresident defendant comports with due process."), amended and superseded on other grounds, 975 F.2d 746 (11th Cir. 1992), modified and superseded on other grounds, 985 F.2d 1534 (11th Cir. 1993); Complete Concepts, 880 F.2d at 388 ("[O]nce we are satisfied that the courts of the forum state have construed their long arm statute into lock-step conformity with the Constitution, the problem reduces to whether the defendant purposefully established 'minimum contacts' in the forum 'such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice."'" (quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S. Ct. 154, 158 (1945)); Peridyne Tech. Solutions, LLC v. Matheson Fast Freight, Inc., 117 F. Supp. 2d 1366, 1369 (N.D. Ga. 2000) ("Where a state's long-arm statute confers personal jurisdiction to the limits of Due Process, the court may pass over analysis of the statute and exercise jurisdiction where the constitutional requirements are satisfied."); Horsley v. Feldt, 128 F. Supp. 2d 1374, 1377 (N.D. Ga. 2000) ("If, however, a state's long arm statute confers personal jurisdiction to the limits of the Due Process Clause, the Court may pass over analysis of the statute and exercise jurisdiction where the constitutional requirements are satisfied."); Maxwell Chase Techs., L.L.C. v. KMB Produce, Inc., 79 F. Supp. 2d 1364, 1367 (N.D. Ga. 1999) ("Where a state's long arm statute confers personal jurisdiction to the limits of Due Process, the Court may pass over analysis of the statute and exercise jurisdiction where the constitutional requirements are satisfied."); Railcar, Ltd. v. S.

11

In 2005, however, the Georgia Supreme Court clarified the status of the state's long-arm statute, at once broadening the statute's reach and injecting renewed vitality into its restrictions. Innovative Clinical & Consulting Servs., LLC v. First Nat'l Bank of Ames, Iowa, 620 S.E.2d 352 (Ga. 2005). Most significantly, the supreme court made clear that a trial court must undertake two inquiries, one under the Georgia long-arm statute and another under due process. It explained that "'[t]he rule that controls is our statute, which requires that an out-of-state defendant must do certain acts within the State of Georgia before he can be subjected to personal jurisdiction.'" Id. at 353 (emphasis added) (quoting Gust v. Flint, 356 S.E.2d 513, 514 (Ga. 1987)). We have not yet had the opportunity to address Innovative Clinical and its impact on our jurisprudence regarding Georgia's long-arm statute. Thus, we begin with a thorough examination of Innovative Clinical. We conclude that, through Innovative Clinical, the Georgia Supreme Court has demonstrated that our previous approach is an incorrect

Ill. Railcar Co., 42 F. Supp. 2d 1369, 1372 (N.D. Ga. 1999) ("[T]he Georgia long arm statute does confer personal jurisdiction to the full extent permitted by the Due Process Clause of the United States Constitution . . . . Accordingly, the Court will move directly to consideration of whether the exercise of personal jurisdiction over SIRC is consistent with the Due Process Clause."); Urspruch v. Greenblum, 968 F. Supp. 707, 710 (S.D. Ga. 1996) ("'When the courts of the forum State have interpreted the forum's long-arm statute to confer jurisdiction to the limits allowed by federal due process, state law need not be applied: [the Court] need only ask whether the exercise of jurisdiction over the nonresident defendant comports with due process.'") (alteration in original) (quoting Francosteel Corp. v. M/V Charm, 825 F. Supp. 1074, 1077 (S.D. Ga. 1993)).

statement of Georgia law: the Georgia long-arm statute does not grant courts in Georgia personal jurisdiction that is coextensive with procedural due process.[9] Instead, the long-arm statute must be read literally. It imposes independent obligations that a plaintiff must establish for the exercise of personal jurisdiction that are distinct from the demands of procedural due process.[10]

It is beyond cavil that the exercise of personal jurisdiction in Georgia requires a court to find that at least one prong of the long-arm statute is satisfied. See Rudo v. Stubbs, 472 S.E.2d 515, 516 (Ga. Ct. App. 1996). Innovative Clinical

---

[9] Indeed, the Georgia Supreme Court specifically noted our court's "erroneous" interpretation of the state's long-arm statute:

> Although the Federal courts persist in reiterating the language from First United Bank of Mississippi [v. First National Bank of Atlanta, 340 S.E.2d 597 (Ga. 1986)], that Georgia's long-arm statute confers in personam jurisdiction to the maximum extent allowed by the due process clause of the U.S. Constitution, e.g., Francosteel Corp. v. M/V Charm, 19 F.3d 624 (IV) (11th Cir. 1994), the First United holding was superseded by Gust [v. Flint, 356 S.E.2d 513 (Ga. 1987)]. The Eleventh Circuit's interpretation of OCGA § 9-10-91 is not binding on this Court and it is not necessary for this Court to correct erroneous Federal interpretations of our State's statutes for the precedential value of our opinions to remain the controlling authority on the proper interpretation of those statutes.

Innovative Clinical & Consulting Servs., LLC v. First Nat'l Bank of Ames, Iowa, 620 S.E.2d 352, 354 n.2. (Ga. 2005).

[10] The Georgia long-arm statute enumerates five separate bases for the exercise of personal jurisdiction, encompassing various types of "acts, omissions, ownership, use, or possession" that can subject a defendant to the statute's reach. O.C.G.A. § 9-10-91. We understand the basic rule of Innovative Clinical to apply to all subsections of the statute, see Innovative Clinical, 620 S.E.2d at 354–55 (discussing O.C.G.A. § 9-10-91(2) and (3)), and we generally adopt the rule requiring courts to apply each provision of the statute literally and independently. Since subsection (1) of the statute—requiring that a defendant "[t]ransact[] any business within this state"—is the only basis for long-arm jurisdiction asserted in this case, however, the balance of our discussion focuses on O.C.G.A. § 9-10-91(1).

clarified that to satisfy the long-arm statute, a nonresident defendant must "do certain acts within the state of Georgia."  620 S.E.2d at 353.  Under subsection (1), the certain act is "[t]ransact[ing] any business within this state." O.C.G.A. § 9-10-91(1).  Since Innovative Clinical, the Georgia Court of Appeals has reaffirmed, as part of "the traditional three-part test used in determining whether long arm jurisdiction exists based on the transaction of business," that such jurisdiction only exists "'if (1) the nonresident defendant has purposefully done some act or consummated some transaction in this state . . . .'"[11]  Aero Toy Store, LLC v. Grieves, 631 S.E.2d 734, 736–37 (Ga. Ct. App. 2006) (emphasis added) (quoting Robertson v. CRI, Inc., 601 S.E.2d 163, 166 (Ga. Ct. App. 2004)).

---

[11]  The full three-part test set forth in Aero Toy Store is as follows:
Jurisdiction exists on the basis of transacting business in this state if (1) the nonresident defendant has purposefully done some act or consummated some transaction in this state, (2) if the cause of action arises from or is connected with such act or transaction, and (3) if the exercise of jurisdiction by the courts of this state does not offend traditional fairness and substantial justice.
Aero Toy Store, LLC v. Grieves, 631 S.E.2d 734, 737 (Ga. Ct. App. 2006) (quoting Robertson v. CRI, Inc., 601 S.E.2d 163, 166 (Ga. Ct. App. 2004)).  The Georgia Court of Appeals then explained that "[t]he initial two prongs of the jurisdictional test are used to determine whether defendant has established the minimum contacts necessary for the exercise of jurisdiction."  Id. (quoting Robertson, 601 S.E.2d at 167–68).  This interpretation, however, which appears to continue to collapse the long-arm test into the "minimum contacts" due process analysis and which relied on quoted language from a Georgia Court of Appeals decision issued prior to Innovative Clinical, is inconsistent with the independent and literal long-arm inquiry mandated by the Georgia Supreme Court in Innovative Clinical.  Therefore, to remain faithful to Innovative Clinical, we interpret the first prong of this test as reflecting the requirement of subsection (1) of the long-arm statute and the second and third prongs as comprising the traditional due process inquiry.  The significance of the three-prong approach is that, under Georgia law, there must be a long-arm assessment that is separate and apart from the due process analysis.

14

Accordingly, subsection (1) long-arm jurisdiction in Georgia expressly depends on the actual transaction of business—the doing of some act or consummation of some transaction—by the defendant in the state.

It is clear that the Innovative Clinical court intended to broaden the reach of the long-arm statute by stripping away certain limitations, not expressly contained in the statute, that various courts had injected into the statute over time.[12] For example, courts had limited the application of subsection (1) to contract cases and construed it to require the nonresident defendant's physical presence in Georgia (thereby minimizing the import of the nonresident's intangible contacts with the state), even though neither requirement appears on the face of the statute. Innovative Clinical, 620 S.E.2d at 355. In adopting a literal construction of subsection (1), the supreme court appropriately discarded such artificial limitations on the statutory jurisdiction of courts in Georgia. We recognize the importance of the supreme court's abandonment of these extraneous limitations on the statute, and in our effort to follow the supreme court's instruction to "give the same literal construction to subsection (1) of O.C.G.A. § 9-10-91 that we give to the other subsections," we adopt the court's approach. Id.

---

[12] Innovative Clinical, 620 S.E.2d at 355 ("We hereby overrule all prior cases that fail to accord the appropriate breadth to the construction of the 'transacting any business' language of OCGA 9-10-91(1).")

The Georgia Supreme Court did not, however, jettison the lone and unequivocal requirement that subsection (1) plainly does impose: "under that literal construction, O.C.G.A. § 9-10-91(1) grants Georgia courts the unlimited authority to exercise personal jurisdiction over any nonresident <u>who transacts any business in this State</u>." <u>Id.</u> (emphasis added). Thus, literally transacting business within Georgia remains a precondition to long-arm jurisdiction that is independent from the dictates of due process.

After emphasizing this point, the supreme court immediately recognized that even this literal construction of subsection (1) would "expand the personal jurisdiction of Georgia courts beyond that permitted by constitutional due process," by, for example permitting jurisdiction over a defendant who literally transacts any business in Georgia but over whom, in the circumstances of a particular case, the exercise of jurisdiction would violate due process. <u>Id.</u> To address this concern, the court reasonably qualified its holding by adding the proviso that "we accordingly construe subsection (1) as reaching <u>only</u> 'to the maximum extent permitted by procedural due process.'" <u>Id.</u> (emphasis added) (quoting <u>Coe & Payne, Co. v. Wood-Mosaic Corp.</u>, 195 S.E.2d 399, 401 (Ga. 1973)).

Lest there be any misunderstanding, this language does <u>not</u> mean that subsection (1)—or any provision of the long-arm statute—is coextensive with

16

constitutional due process. Rather, this language makes clear that due process

concerns may limit the full extent of the "transacts any business" prong. But this

certainly does not mean that the two inquiries are one and the same.

Indeed, the Georgia Supreme Court explained that the long-arm statute is not

coextensive with due process when it stated that the statute's various "limiting

conditions may <u>preclude</u> a Georgia court from exercising personal jurisdiction over

the nonresident to the fullest extent permitted by constitutional due process." <u>Id.</u> at

354 (construing O.C.G.A. § 9-10-91(3)) (emphasis added). The supreme court

also noted the Georgia General Assembly's retention of statutory limitations on

jurisdiction, despite pleas from the state judiciary to expand personal jurisdiction to

the outer limits of due process, and directed that courts must abide by the plain and

unambiguous restrictions provided by the legislature, even if those literal limits

deprive allegedly damaged Georgians of a forum in the state.[13] <u>Id.</u> at 355 (same).

---

[13] Because the Georgia Supreme Court's frank statement on this point is both thorough and emphatic, we are moved to include it at length:

> For over 17 years the justices of this Court and the judges of the Court of Appeals have urged the Legislature to amend Georgia's long-arm statute so as to provide the maximum protection for Georgia residents damaged by the out-of-state acts or omissions committed by nonresident tortfeasors. <u>See</u> <u>Gust</u>, <u>supra</u>, 257 Ga. at 130, 356 S.E.2d 513 (Gregory, J., concurring); <u>Phears v. Doyne</u>, 220 Ga. App. 550, 552, 470 S.E.2d 236 (1996) (Beasley, C.J., concurring specially). Despite the eloquence of these pleas, the Legislature has chosen to retain the statutory limitations on in personam jurisdiction set forth in OCGA § 9-10-91(3). In our system of checks and balances, it is as inappropriate for the judicial branch to encroach upon the powers of the legislative or executive branches as it would be for either of those branches to encroach upon the powers of the judicial branch. Thus, . . . the fact that Georgians damaged by nonresidents are deprived of a

17

The Innovative Clinical court further explained the importance of giving independent meaning to the provisions of the long-arm statute when discussing subsections (2) and (3). First, it made clear that subsection (3) of the long-arm statute contains independent limits on the exercise of jurisdiction. Id. at 355. Second, it reaffirmed Gust v. Flint, which rejected cases that had "held that subsection (2) was constrained only by, and thus was coextensive with, the Fourteenth Amendment of the U.S. Constitution." Id. at 354. It did so because reading subsection (2) to the limits of due process rendered subsection (3) superfluous, thereby eviscerating legislative intent. Id. at 354. Likewise, reading subsection (1) to be coextensive with due process would render subsection (3) superfluous. It would defy common sense to suggest that the Innovative Clinical court intended to turn the "transacts any business within Georgia" prong into the new stepping stone around subsection (3).

---

forum in this State to the fullest extent permitted by due process is not the result of court decisions interpreting OCGA § 9-10-91(3) but the result of the plain and unambiguous language of OCGA § 9-10-91. The courts cannot reject the plain language of a statute unless it will lead to unreasonable consequences or absurd results not contemplated by the Legislature. See generally Haugen v. Henry County, 277 Ga. 743(2), 594 S.E.2d 324 (2004); Hollowell v. Jove, 247 Ga. 678, 681, 279 S.E.2d 430 (1981). Accordingly, under these circumstances, the courts may not interpret OCGA § 9-10-91 to provide what the Legislature chose to omit.

Innovative Clinical, 620 S.E.2d at 355. Although in this particular passage the supreme court was directly addressing O.C.G.A. § 9-10-91(3), which provides for jurisdiction in specified circumstances over nonresidents committing tortious conduct outside of the state that causes injury within Georgia, the mandate of deference to the choices of the legislature, as expressed in plain statutory language, applies with equal force to the particular limitations contained in each and every subsection of the long-arm statute.

18

Georgia courts have yet to fully explain the scope of the "[t]ransacts any business within this state" language. O.C.G.A. § 9-10-91(1). The unavoidable conclusion, as explained by the Georgia Supreme Court and also supported by traditional canons of statutory construction, is that this literal language, intentionally included by the Georgia General Assembly, must have some independent meaning. To equate any prong of the long-arm statute with the federal due process inquiry would render the language of the statute meaningless. See Chatman v. Findley, 548 S.E.2d 5, 7 (Ga. 2001) ("Because the General Assembly is presumed to intend something by passage of the act, we must construe its provisions so as not to render it meaningless."). The statutory requirement that a nonresident defendant transact any business in Georgia must mean something more than, and cannot simply equate to, mere minimum contacts in a due process sense.

Were the two truly meant to be coextensive, the General Assembly simply would have adopted statutory language expressly incorporating constitutional due process as the sole limitation on jurisdiction, as several other states have done.[14]

---

[14] See, e.g., Ala. R. Civ. P. 4.2(b) ("An appropriate basis exists for service of process . . . when the person or entity has such contacts with this state that the prosecution of the action . . . is not inconsistent with the constitution of this state or the Constitution of the United States."); Ariz. R. Civ. P. 4.2(a) ("A court of this state may exercise personal jurisdiction over parties, whether found within or outside the state, to the maximum extent permitted by the Constitution of this state and the Constitution of the United States."); La. Rev. Stat. Ann. § 13:3201(B) ("In addition to the provisions of Subsection A, a court of this state may exercise personal jurisdiction over a nonresident on any basis consistent with the constitution of this state and of the Constitution of the United States."); Or. R. Civ. P. 4(L) (providing personal jurisdiction,

19

Moreover, equating the two inquiries would transform the ordinary search for the

legislative meaning of the Georgia Assembly into a search for what the Supreme

Court of the United States would allow under the evolving due process standard.

Ultimately, unless and until the Georgia courts provide further authoritative

guidance, courts in this circuit construing the statute literally will have to delineate

the precise contours of the "[t]ransacts any business within this state" requirement

of O.C.G.A. § 9-10-91(1) according to the facts of each case.[15]

In sum, we adopt the guidance of the Georgia Supreme Court. We can no

longer construe the Georgia long-arm statute as coextensive with constitutional due

process. Instead, in assessing the propriety of the exercise of personal jurisdiction,

---

"[n]otwithstanding a failure to satisfy the requirement of sections B through K of this rule, in any action where prosecution of the action against a defendant in this state is not inconsistent with the Constitution of this state or the Constitution of the United States").

[15] We do, however, caution the federal courts of this circuit to resist any temptation to define "[t]ransacts any business" solely or primarily in terms of the "foreseeability" of an impact on the Georgia forum, a concept frequently featured in the due process "minimum contacts" analysis. To do so would once again improperly conflate the long-arm and due process inquiries. Unlike the due process analysis, O.C.G.A. § 9-10-91(1), on its face, includes no element of "foreseeability." Although we do not go so far as to say that the "foreseeability" of an impact on the forum can never be a relevant consideration, there may be many instances in which such notions of "foreseeability" have absolutely no bearing on whether particular conduct can fairly and plausibly constitute the transaction of business in the state. Accordingly, engrafting a "foreseeability" component, which the Georgia General Assembly has not seen fit to include, onto the subsection (1) long-arm requirement would amount to just the sort of extension of the long-arm statute beyond its literal terms that the Georgia Supreme Court rejected in Innovative Clinical. See Innovative Clinical, 620 S.E.2d at 354, 355. Instead, regardless of their preferences or attempts to resort to analytical shortcuts, our courts must be limited to the bare language of the statute. Under subsection (1), analyzing whether the nonresident defendant "[t]ransacts any business within this state" is the sole touchstone of long-arm jurisdiction.

courts must apply the specific limitations and requirements of O.C.G.A. § 9-10-91 literally and must engage in a statutory examination that is independent of, and distinct from, the constitutional analysis to ensure that both, separate prongs of the jurisdictional inquiry are satisfied.

B.

We now turn to the district court's personal jurisdiction analysis in this case. We conclude that, although it is unclear whether the district court properly and independently applied the long-arm statute pursuant to the standard we set forth today, our own analysis persuades us to affirm the district court's conclusion.[16]

In its August 3, 2007, order denying the motion to dismiss for lack of personal jurisdiction, the district court properly cited O.C.G.A. § 9-10-91(1) as the controlling provision of the long-arm statute. The district court cited Innovative Clinical and the traditional three-part test for whether a nonresident transacted business within Georgia. Diamond Crystal Brands, Inc. v. Food Movers Int'l Inc., No. CV407-42, 2007 WL 2258715, at *2 (S.D. Ga. Aug. 3, 2007) (citing Aero Toy Store, LLC v. Grieves, 631 S.E.2d 734, 737 (Ga. Ct. App. 2006)). Nevertheless, it appears to us that the district court conducted an analysis chiefly

---

[16] See Cuddeback v. Fla. Bd. of Educ., 381 F.3d 1230, 1235 (11th Cir. 2004) ("This court may affirm a judgment on any legal ground, regardless of the grounds addressed and relied upon by the district court.").

21

focused on minimum contacts for due process purposes, without sufficient independent consideration of the statutorily required element of transacting business in the state.[17]  One result of the conjoined analysis was that the district court considered facts that were not relevant to the narrower question of whether Food Movers transacted any business in Georgia in a matter that gave rise to Diamond Crystal's cause of action.

Although we cannot say that the district court's approach was entirely unreasonable—after all, it relied on language from a decision of the Georgia Court of Appeals—we have already explained why we believe that this view of the personal jurisdiction test is fundamentally incompatible, as a matter of Georgia law, with the controlling pronouncement of the standard by the Georgia Supreme Court in Innovative Clinical. See supra part III & n.11.  Nevertheless, we conclude that a remand is unnecessary: the breadth of the Georgia long-arm statute and the

---

[17] For example, the court explained that the first two prongs of the three-part Aero Toy Store test go to "whether the defendant has sufficient minimum contacts with the forum." Diamond Crystal, 2007 WL 2258715, at *2.  This interpretation effectively read the independent long-arm inquiry mandated by Innovative Clinical out of the test and erroneously made the whole analysis about constitutional due process.

Additionally, the court's recitation of facts—replete with references to "contacts" and "purposeful activity directed at the forum state," id. at *3—is virtually indistinguishable from a constitutional due process discussion.  Thus, although the district court found that "Food Movers' conduct and knowledge shows that it purposefully conducted business within the forum state," id. at *4, which at first blush sounds like a finding of "transacting any business" within Georgia, it is unclear whether the district court was sufficiently mindful of the independent requirements imposed by the Georgia long-arm statute.

22

facts that the district court did properly consider support a finding of jurisdiction under O.C.G.A. § 9-10-91(1).

IV.

As discussed in part III, supra, Georgia's long-arm statute permits jurisdiction where a plaintiff's cause of action "arises out of" a nonresident defendant's "transact[ion] of any business within [Georgia]." O.C.G.A. § 9-10-91(1). In light of Innovative Clinical & Consulting Servs., LLC v. First Nat'l Bank of Ames, Iowa, we must interpret this statute literally and give full effect to the breadth of its language. 620 S.E.2d 352, 353, 355 (Ga. 2005).

Interpreted literally, "transacts any business" requires that the "'nonresident defendant has purposefully done some act or consummated some transaction in [Georgia] . . . .'" Aero Toy Store, LLC v. Grieves, 631 S.E.2d 734, 737 (Ga. Ct. App. 2006) (quoting Robertson v. CRI, Inc., 601 S.E.2d 163, 166 (Ga. Ct. App. 2004)). That said, a defendant need not physically enter the state. As a result, a nonresident's mail, telephone calls, and other "intangible" acts, though occurring while the defendant is physically outside of Georgia, must be considered. Innovative Clinical, 620 S.E.2d at 355–56. Therefore, we examine all of a nonresident's tangible and intangible conduct and ask whether it can fairly be said

23

that the nonresident has transacted any business within Georgia.[18]  Here, because

Food Movers sent purchase orders to a specific Georgia manufacturer, required

delivery by customer pickup, arranged for third parties to pick up Splenda that it

purchased in Georgia, and promised to pay money into Georgia, we conclude that

it did.

In both transactions at issue, Food Movers sent purchase orders to Nasser,

Diamond Crystal's California agent.[19]  Each purchase order explicitly required (1)

that it be "ship[ed] to: Diamond Crystal, 3000 Tremont Road . . . , Savannah, GA,"

(2) specified the price and quantity of Splenda, and (3) required delivery by

"[c]ustomer picku[p]."  One of the purchase orders even more explicitly required

"p/u in Savannah, Ga on 12/28/05."  Thus, although Food Movers routed the

purchase orders through Nasser and never physically brought the orders to

Georgia, Food Movers sent the orders to a specific Georgia manufacturing facility

---

[18]  In conducting this mixed law and fact inquiry, we find instructive the literal definition of the words in the statute.  "Transact" means "to prosecute negotiations," to "carry on business," "to carry out," or "to carry on."  Webster's Third New Int'l Dictionary 2425 (1993).  "Any" means "to any extent" or "in any degree."  Id. at 97.  "Business" means "activity directed toward some end," or "a usually commercial or mercantile activity customarily engaged in as a means of livelihood," or "transactions, dealings, or intercourse of any nature."  Id. at 302.  Hewing closely to the plain meaning of the statute serves the twin goals of giving effect to legislative intent and not engrafting requirements that do not appear on the face of the "plain and unambiguous statutory language," Innovative Clinical, 620 S.E.2d at 355.

[19] Ultimately, we conclude that Food Movers transacted business in Georgia on the basis of the two transactions at issue in the breach of contract complaint; therefore, we do not rely on Food Movers's completed transactions for the purposes of the long-arm analysis.

and required delivery of the product in Georgia. After Innovative Clinical, Food Movers's routing of the purchase orders through a California intermediary—much like routing them through the postal service—does not prevent us from considering the purchase orders in the "transacts any business" equation.[20]

Significantly, Food Movers admits that Diamond Crystal tendered the two shipments at its Savannah plant and that the shipments were picked up. Food Movers claims that this is irrelevant because it was Food Movers's third-party customers who for their own account actually picked up the Splenda. We reject this argument.

First, we have held that "designat[ing] certain parties within the State of Georgia for receipt of the goods purchased under the contract" helps support a finding that a nonresident transacted business in Georgia. Gold Kist, Inc. v. Baskin-Robbins Ice Cream Co., 623 F.2d 375, 380 (5th Cir. 1980). In Gold Kist, Baskin-Robbins contracted with a Georgia cooperative for the sale of pecans. Id. at 376. It is unclear whether Baskin-Robbins ever personally accepted delivery of the pecans in Georgia. It did, however, designate a company located in Georgia to

---

[20] We do not decide, however, that O.C.G.A. § 9-10-91(1) encompasses every transaction where a citizen from one state contracts with a Georgia manufacturer. We hold only that, in light of the Georgia Supreme Court's clarification that a party's intangible actions can amount to the transaction of business, Food Movers's sending purchase orders to a specific Georgia manufacturer and requiring delivery by customer pickup cannot be ignored in the long-arm inquiry.

25

receive delivery, thus "part performance under the contract was to be effected in Georgia, by Baskin Robbins' own choosing." Id at 380. Likewise, in the purchase orders at issue here, Food Movers specified delivery by customer pickup in Savannah. Although Food Movers never took physical possession of the Splenda, it did allow third parties to accept delivery of its Splenda in Georgia. Additionally, because manufacturers ordinarily do not release truckloads of product to random carriers, we can infer that Food Movers sent some communication to Diamond Crystal informing it of which carrier would pickup the Splenda in Savannah. See, e.g., O.C.G.A. § 11-2-319(3) ("Unless otherwise agreed in any case [when the term is F.O.B. the place of shipment] . . . the buyer must seasonably give any needed instructions for making delivery. . . ."). Thus, Food Movers also must have sent "evidence" to Georgia, either directly or by way of a third-party.

Second, under Georgia's enactment of the Uniform Commercial Code ("U.C.C."), Food Movers took title to the Splenda upon Diamond Crystal's tender, regardless of who actually hired the common carrier. "Unless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods . . . ." O.C.G.A. § 11-2-401(2).[21] The parties observed an F.O.B. Savannah delivery[22]

_____

[21] Food Movers never claimed that it merely assigned its right to the Splenda under the contract with Diamond Crystal. Rather, Food Movers has always maintained that it resold the

26

term by customer pickup; as a result, when Diamond Crystal tendered the goods at its Georgia plant and issued a bill of lading listing Food Movers as the consignee, Food Movers took legal title to the Splenda. See Wells Dairy, Inc. v. Food Movers Int'l, Inc., 566 F. Supp. 2d 933, 943 (N.D. Ia. 2008). After Innovative Clinical, taking physical possession of the Splenda in Georgia is not necessary; Food Movers took legal title to goods located in Georgia, and that can be considered for the purposes of O.C.G.A. § 9-10-91(1). 620 S.E.2d at 355; but see O.N. Jonas Co. v. B & P Sales Corp., 206 S.E.2d 437, 439 (Ga. 1974) ("The goods were shipped [F.O.B. Georgia] . . . and, as we read this record, that is the only contact that appellees had with this state . . . . We hold that this is an insufficient 'contact' with the State of Georgia to comply with the requirement of [O.C.G.A. § 9-10-91(1)] . . . .").[23]

_____

Splenda. The bills of lading bear this out; each lists Food Movers as the "Consignee," which means the entity "to whom or to whose order the bill promises delivery." O.C.G.A. 11-7-102(b). That Food Movers resold the Splenda rather than assigned its rights to it is significant because a present assignment of a contractual right immediately vests title in the assignee. Gamble v. Mathias, 61 F.2d 911, 911 (5th Cir. 1932) (concluding that an assignment of an insurance contract vested title to proceeds on the contract immediately even though the insurance company had not yet paid the claim); Id. ("[A] present assignment of an interest passes the title to it as of the date of the assignment.").

[22] Whether the F.O.B. Savannah term, in light of any other pertinent factors, constitutes sufficient "transact[ion of] any business" in Georgia by Food Movers to support the exercise of personal jurisdiction under Georgia's long-arm statute does not depend on who proposed the term.

[23] Innovative Clinical likely overruled O.N. Jonas because O.N. Jonas did not give sufficient breadth to the "transacts any business" language of the long-arm statute. Regardless,

Finally, the course of dealing between the parties makes clear that Food Movers was to pay for the Splenda by transferring funds to Georgia. In each of the twelve transactions in which Food Movers did pay for the Splenda, it sent payments to Diamond Crystal in Georgia. The implied promise to send payments to Georgia is relevant to whether Food Movers transacted any business there.

In total, we find that Food Movers transacted business within Georgia. Food Movers sent purchase orders to Diamond Crystal in Georgia, Food Movers requested delivery by "customer pickup" at Diamond Crystal's plant in Savannah, Food Movers directed third parties to accept delivery of the goods in Savannah, Food Movers took legal title to the goods in Georgia, and Food Movers promised to pay money into Georgia on the two transactions in question. Thus, personal jurisdiction is appropriate under O.C.G.A. § 9-10-91(1).

## V.

Having found that Georgia's long-arm statute permits jurisdiction, we reach the jurisdictional analysis under the Due Process Clause of the Fourteenth Amendment. Food Movers casts itself as a passive buyer of goods whose sole contacts with Georgia involved indirectly sending purchase orders and directly sending payments. Appellant's Br. at 13–14. Food Movers contends that such a

---

that Food Movers took title to the goods is but one fact that supports the conclusion that it transacted business in Georgia.

limited connection with the forum cannot satisfy the due process requirement of minimum contacts. We conclude that the Due Process Clause permits jurisdiction. Food Movers established sufficient minimum contacts when it purposefully carried on a substantial and ongoing relationship with a Georgia manufacturer, specified delivery by "customer pickup" in Savannah, took and transferred legal title to product in Savannah, and sent payments to Savannah on twelve of the fourteen transactions.

The Due Process Clause protects an individual's liberty interest in not being subject to binding judgments imposed by foreign sovereigns. Burger King Co. v. Rudzewicz, 471 U.S. 462, 471–72, 105 S. Ct. 2174, 2182 (1985). The heart of this protection is fair warning—the Due Process Clause requires "'that the defendant's conduct and connection with the forum State [be] such that he should reasonably anticipate being haled into court there.'" Burger King, 471 U.S. at 474, 105 S. Ct. at 2183 (quoting World-Wide Volkswagon Corp. v. Woodson, 444 U.S. 286, 297, 100 S. Ct. 559, 567 (1980)). Therefore, states may exercise jurisdiction over only those who have established "'certain minimum contacts with [the forum] such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice."'" Helicopteros Nacionales de Columbia S.A. v. Hall, 466 U.S. 408, 414, 104 S. Ct. 1868, 1872 (1984) (alteration in original) (quoting Int'l Shoe

Co. v. Washington, 326 U.S. 310, 316, 66 S. Ct. 154, 158 (1945)).

It is undisputed that if Food Movers is subject to jurisdiction at all, it is subject to specific jurisdiction. In specific jurisdiction cases, the "fair warning requirement is satisfied if the defendant has purposefully directed his activities at residents of the forum . . . and the litigation results from alleged injuries that arise out of or relate to those activities." Burger King, 471 U.S. at 472–73, 105 S. Ct. at 2182 (internal quotations omitted). Put differently, the defendant must have "purposefully availed" itself of the privilege of conducting activities—that is, purposefully establishing contacts—in the forum state and there must be a sufficient nexus between those contacts and the litigation. Once this showing is made, a defendant must make a "compelling case" that the exercise of jurisdiction would violate traditional notions of fair play and substantial justice. Id. at 477, 105 S. Ct. at 2185; Cable/Home Commc'n Corp. v. Network Prods., Inc., 902 F.2d 829, 858–59 (11th Cir. 1990).

## A.

We conclude that Diamond Crystal's cause of action grew out of Food Movers's purposeful contact with Georgia such that Food Movers reasonably should have anticipated defending suit there. At the outset, we underscore that the minimum contacts analysis is "'immune to solution by checklist.'" Sloss Indus.

30

Corp. v. Eurisol, 488 F.3d 922, 925 (11th Cir. 2007) (quoting Prod. Promotions,

Inc. v. Cousteau, 495 F.2d 483, 499 (5th Cir. 1974). Thus, it is settled that

entering a contract with a citizen of another state, standing alone, does not

automatically satisfy the minimum contacts test. Burger King, 471 U.S. at 478,

105 S. Ct. at 2185.

Rather, when inspecting a contractual relationship for minimum contacts, we

follow a "highly realistic approach" that focuses on the substance of the

transaction: prior negotiations, contemplated future consequences, the terms of the

contract, and the actual course of dealing. Id. at 479, 105 S. Ct. at 2185 (internal

quotation omitted). The focus must always be on the nonresident defendant's

conduct, that is, whether the defendant deliberately engaged in significant activities

within a state or created continuing obligations with residents of the forum. Id. at

480, 105 S. Ct. at 2186–87. This focus ensures that a defendant will not be subject

to jurisdiction based solely on "'random,' 'fortuitous,' or 'attenuated' contacts."

Id. at 475, 105 S. Ct. at 2183 (quoting Keeton v. Hustler Magazine, Inc., 465 U.S.

770, 774, 104 S. Ct. at 1473, 1478 (1984)).

This case involves a forum seller's effort to sue a nonresident buyer in the

seller's home forum for breach of contract. In this context, we have rejected

jurisdiction when the buyer's sole contact with the forum is contracting with a

31

resident seller who performs there. See Borg-Warner Acceptance Corp. v. Lovett & Tharpe, Inc., 786 F.2d 1055, 1063 (11th Cir. 1986) (refusing to exercise jurisdiction where the primary contact involved an isolated purchase of goods manufactured in the forum under a contract negotiated outside of the forum). This follows from the two well-established propositions that neither merely contracting with a forum resident nor the forum resident's unilateral acts can establish sufficient minimum contacts.

But nonresident purchasers can still be subject to jurisdiction in the seller's forum. Jurisdiction is often found where further contacts or plus factors connect the defendant to the jurisdiction. See, e.g., Sloss Indus., 488 F.3d at 931–33. Courts have considered a defendant's initiating the contractual relationship,[24] visiting the plaintiff's factory to assess or improve quality,[25] sending materials to

---

[24] E.g., Sloss Indus. Corp. v. Eurisol, 488 F.3d 922, 933 (11th Cir. 2007); Sw. Offset, Inc. v. Hudco Publ'g Co., 622 F.2d 149, 150–52 (5th Cir. 1980) (per curiam) (finding minimum contacts where, *inter alia*, defendant sent multiple purchase orders to plaintiff after initial solicitation); Madison Consulting Group v. South Carolina, 752 F.2d 1193, 1202–04 (7th Cir. 1985) (finding minimum contacts where, *inter alia*, the South Carolina defendant "actively reach[ed] out to solicit the services of a Wisconsin partnership" by flying a principal to the initial negotiations in Washington D.C., but cautioning that some solicitations will be too minor); cf. Vetrotex Certainteed Corp. v. Consol. Fiber Glass Prods. Co., 75 F.3d 147, 152 & n.5 (3d Cir. 1996) (refusing to find minimum contacts where the defendant was a "passive buyer," that is, one which has been "solicited as a customer of the plaintiff.").

[25] E.g., Sloss Indus., 488 F.3d at 931; Bell Paper Box, Inc. v. U.S. Kids, Inc., 22 F.3d 816, 820 (8th Cir. 1994) (finding minimum contacts where, *inter alia*, defendant's representative visited the plant to assure the initial run of custom products was satisfactory).

the plaintiff for inspection or use in shipping,[26] participating in the manufacturing process,[27] establishing a relationship by placing multiple orders,[28] requiring performance in the forum,[29] negotiating the contract via telefaxes or calls with the plaintiff;[30] the list goes on. Thus, in Sloss, we found sufficient minimum contacts with Alabama because the nonresident buyer placed ten unsolicited orders in just a few months with an Alabama company, sent a sample to Alabama, sent containers

[26] Sloss Indus., 488 F.3d at 933.

[27] E.g., Sw. Offset, 622 F.2d at 150–52 (finding minimum contacts where, *inter alia*, defendant publisher sent camera ready copies of its telephone directories and corrected proofs to the publisher in the forum); Whittaker Corp. v. United Aircraft Corp., 482 F.2d 1079, 1084 (1st Cir. 1973) (finding minimum contacts where, *inter alia,* the nonresident buyer "actively supervised or actually participated in" the development of the product); U.S. Kids, 22 F.3d at 820 (finding minimum contacts where, *inter alia*, the defendant transmitted "camera-ready artwork necessary for the production of the portfolios and envelopes" to the forum).

[28] E.g., Air Prods. & Controls, Inc. v. Safetech Int'l, Inc., 503 F.3d 544, 551–52 (6th Cir. 2007) ("[T]he parties did not engage in a one-time transaction, but in a continuing business relationship that lasted many years. . . . Such contacts are not 'random,' 'fortuitous,' or 'attenuated,' but are the result of deliberate conduct that amounts to purposeful availment.").

[29] E.g., Biltmoor Moving & Storage Co. v. Shell Oil Co., 606 F.2d 202, 207 (7th Cir. 1979) (finding minimum contacts where, *inter alia,* "the moving contract absolutely required substantial and lengthy performance within Illinois" by all parties to the contract); see N. Penn Gas v. Corning Natural Gas, 897 F.2d 687, 690–91 (3d Cir. 1990) (per curiam) (finding minimum contacts with Pennsylvania where, *inter alia*, the contract required a Pennsylvania gas company to reserve storage space in its fields for a New York gas company, even though the New York company never actually stored gas there).

[30] E.g., Sloss Indus., 488 F.3d at 933; Air Products & Controls, Inc., 503 F.3d at 551–52 (finding minimum contacts in part based on several hundred telephone, email, facsimile, and ordinary mail correspondences for the purpose of discussing contracts and ordering goods); Cent. Freight Lines Inc. v. APA Transp. Corp., 322 F.3d 376, 382 (5th Cir. 2003) ("APA specifically and deliberately 'reached out' to a Texas corporation by telephone and mail with the deliberate aim of entering into a long-standing contractual relationship with a Texas corporation.").

to Alabama for use in shipping, proposed an exclusive contractual relationship, and sent representatives to Alabama with the goal of improving the manufacturing process and furthering the relationship. 488 F.3d at 933.

A crucial, but often overlooked issue, is why these factors are important to the minimum contact analysis. The "plus" factors and further contacts are not talismans. Rather, as the Supreme Court suggested in Burger King, the plus factors indicate that the defendant "deliberate[ly] affiliat[ed]" with the forum, 471 U.S. at 482, 105 S. Ct. at 2187 and thus should reasonably anticipate defending a suit there.

This case is close. In some ways, Food Movers had little to do with Georgia: Food Movers never communicated directly with Diamond Crystal in Georgia, Diamond Crystal's California agent initiated the overall relationship, and Food Movers never took an active role in the manufacturing process. Nevertheless, we conclude that Food Movers purposefully established minimum contacts with Georgia. As we explain, each individual transaction involved meaningful contact with Georgia and, by purposefully engaging in fourteen such transactions in just six months, Food Movers established a substantial and ongoing relationship with a Georgia manufacturer.

The terms of the contracts and the course of performance reveal that the

transactions involved contact with Georgia.  A contract calling for payment and delivery in a forum requires "contact" with the forum.  S & Davis Int'l, Inc. v. Yemen, 218 F.3d 1292, 1305 (11th Cir. 2000) ("Performance logically required contact and interaction with the United States, as discussed in the contract (such as designating a U.S. bank for payment and a point of departure for shipping).").

Here, Food Movers submitted purchase orders to Diamond Crystal's California agent with instructions that the orders be "ship[ed] to: Diamond Crystal, 3000 Tremont Road . . . , Savannah, GA."  Additionally, each purchase order specified that delivery would be by "[c]ustomer picku[p]" and, in most cases, further specified "please have ready to pick up in Savannah, GA" or "pick up in Savannah, GA."  And in each transaction, Food Movers redelivered the product to its third-party customers by allowing its customers to take delivery in Savannah. Food Movers admits that it sent money to Georgia on twelve of the fourteen transactions—that is, every time it paid.  Thus, each transaction involved payment, delivery, and Food Movers's redelivery of the product in Savannah.

Taking all of the transactions together, these purposeful contacts put Food Movers on notice that it could be haled into a Georgia court.  Burger King requires a realistic examination of the entire course of dealing.  In just six months, Food Movers purchased more than $1.9 million dollars worth of Splenda in fourteen

35

transactions, each of which involved purposeful and meaningful contact by Food Movers with Georgia. Fourteen of these transactions in six months amounts to a substantial relationship in which Food Movers deliberately associated with Georgia. See Burger King, 471 U.S. at 473, 105 S. Ct. at 2182 ("[W]e have emphasized that parties who 'reach out beyond one state and create continuing relationships and obligations with citizens of another state,' are subject to regulation and sanctions in the other State for the consequences of their activities.") (quoting Travelers Health Ass'n v. Va. ex rel. State Corp. Comm'n, 339 U.S. 643, 647, 70 S. Ct. 927, 929 (1950)). Thus, the "'quality and nature'" of Food Movers's interstate transaction with Diamond Crystal and Georgia is not so random or fortuitous that it "cannot fairly be said that [Food Movers] 'should reasonably anticipate being haled into court' [there]." Burger King, 471 U.S. at 486, 105 S. Ct. at 2189 (quoting World-Wide Volkswagon, 444 U.S. at 297, 100 S. Ct. at 567).

Food Movers contends that our precedent forecloses this result. Specifically, it reads Borg-Warner Acceptance Corp. v. Lovett & Tharpe, Inc., 786 F.2d 1055 (11th Cir. 1986), and Sloss Industries Co. v. Eurisol, 488 F.3d 922 (11th Cir. 2007), for the rule that only nonresident buyers who are actively "involved in the production process in the forum" can have sufficient minimum contacts.

36

Appellant's Br. at 26. Neither case requires such a broad rule, and, in any event, Food Movers's conduct went beyond that of a mere "passive purchaser."

Borg-Warner, for its part, involved an isolated purchase of goods produced in a forum. 786 F.2d at 1059. In this context, the court held that minimum contacts cannot be based merely on the manufacturing of the goods in the forum and a postdelivery forum visit to return defective merchandise. Id. at 1063. On its facts, Borg-Warner is thus distinguishable because it involved a lone transaction, whereas, here, Food Movers engaged in an ongoing course of dealing with Diamond Crystal.

Sloss involved a nonresident defendant who placed ten purchase orders for goods produced in and shipped from Alabama. 488 F.3d at 931. The Sloss court properly distinguished the one-time transaction in Borg-Warner on this ground. Id. The court concluded, however, that the number of transactions, standing alone, could not give rise to minimum contacts because of our holding in Banton Industries v. Dimatic Die & Tool Co., 801 F.2d 1283 (11th Cir. 1986). Id. Banton held that a Nebraska firm lacked minimum contacts with Alabama when it filled an unsolicited order for goods shipped F.O.B. Omaha to an Alabama corporation, notwithstanding that the parties had engaged in similar transactions in previous years. 801 F.2d at 1284. The Sloss court distinguished Banton and found

37

minimum contacts because, in addition to the number of transactions, the nonresident defendant placed unsolicited orders, had its agent send containers to Alabama for use in shipping, visited the forum for the purpose of improving quality, and proposed an exclusive relationship with the manufacturer in the forum. 488 F.3d at 933.

Sloss does not decide this case in Food Movers's favor for two reasons. First, as in Sloss, we think that Banton is distinguishable. Second, like the defendant in Sloss, Food Movers's purposeful contact with the forum went beyond that of a completely passive purchaser.

First, Banton is distinguishable. Other than merely accepting the order from the Alabama plaintiff, the transaction in Banton involved literally no contact with the proposed Alabama forum. See 801 F.2d at 1284 (characterizing the issue as "whether the due process clause prohibits the exercise of personal jurisdiction over a defendant whose sole contact with the forum state was an out-of-state sale of goods to a resident of the forum state."). Therefore, Banton held only that when the defendant's sole contact with the forum is contracting with a forum resident, even a history of such transactions does not provide sufficient minimum contacts. Here, by contrast, in each individual transaction, Food Movers sent payment to Georgia and accepted delivery and redelivered the Splenda in Georgia.

38

Second, although Diamond Crystal initially approached Food Movers in California about the possibility of selling sweetener to it, Food Movers was far from a passive purchaser. Diamond Crystal's solicitation resulted only in an unenforceable general agreement about price and delivery terms. Diamond Crystal Brands Inc. v. Food Movers Int'l, Inc., No. 407-42, 2008 WL 2811940, at *5–6 (S.D. Ga. July 21, 2008) (finding that Food Movers presented "no evidence" that an overarching distributorship contract governed the relationship). Thus, no enforceable, overarching supply agreement governed the transactions, and Food Movers had no obligation to purchase Splenda from Diamond Crystal. Rather, seemingly without further solicitation,[31] Food Movers voluntarily submitted fourteen purchase orders to Diamond Crystal's California agent. That a plaintiff first solicited a nonresident defendant does not nullify the significance of a

_____

[31] See Aff. of Anthony LaMonica, ¶¶ 15–16, Mar. 30, 2007 ("Nasser Company and Diamond Crystal Brands, Inc. sent their representatives to Food Movers' offices . . . . After that meeting at Food Movers' office, Nasser Company took several orders from Food Movers . . . ."); Aff. of Thomas Samuel LaMonica, ¶ 17, Mar. 5, 2008 ("I subsequently negotiated with Mr. Seibel and we agreed upon contract for Splenda sales at a case price of $31.40 with a minium quantity of 11,000 cases per month."); Id. at ¶ 19 ("Once our credit application was accepted by Diamond Crystal Brands, Inc. . . . we submitted our first purchase order to the broker, Nasser . . . ."); Id. at ¶ 27 ("All of the purchase order submitted to Nasser were processed without further discussion . . . ."); see also Appellant's Reply Br. at 4 ("Following the telephone contacts by Nasser and Seibel in California and the meetings at Food Movers' offices in California, for several months between August 2005 and January 2006 Food Movers submitted purchase orders to Nasser in California for bulk quantities of Splenda.") (emphasis added). It does appear that after the initial five purchase orders, Diamond Crystal approached Food Movers to renegotiate the minimum quantities per month and price terms. Aff. of Thomas Samuel LaMonica, ¶ 23, Mar. 5, 2008.

39

defendant's initiation of subsequent transactions. See Sw. Offset, Inc. v. Hudco Publ'g Co., 622 F.2d 149, 150, 151–52 (5th Cir. 1980) (per curiam) (holding that when "Southwest, a Texas corporation, solicited Hudco's business through Southwest's sales representative in Alabama," and when, "[a]fter the initial order was placed with the sales representative, Hudco placed subsequent orders, approximately eight," Hudco "was no mere passive customer of a Texas corporation" in part because "Hudco repeatedly placed orders with the Texas corporation."). Therefore, Food Movers deliberately reached out to Diamond Crystal by voluntarily and purposefully initiating subsequent transactions.[32]

Moreover, the delivery terms and course of delivery underscore the connection between Food Movers and Georgia. The parties agreed that the Splenda would be delivered F.O.B. Savannah, Georgia, but cannot agree on who proposed the term. Accepting, *arguendo*, Food Movers's version of the facts, Diamond Crystal required the F.O.B. Savannah term because of the "volume of

_____

[32] Nor does Food Movers's routing of the purchase orders through Diamond Crystal's California agent negate Food Movers's reaching out to Georgia. In Burger King, the Supreme Court rejected the argument that because the Michigan defendant primarily interacted with the Florida plaintiff's Michigan office, the defendant had no reason to anticipate suit in Florida. 471 U.S. at 480, 105 S. Ct. at 2186. Such a holding would ignore substantial record evidence that the defendant "knew that he was affiliating himself with an enterprise based primarily in Florida." Id. Here, similarly, the record shows that Food Movers knew that it was contracting with a Georgia manufacturer: each Food Movers purchase order specified Diamond Crystal's Savannah, Georgia plant; Food Movers requested delivery by customer pickup in Savannah; and Food Movers paid money into Savannah.

sweetener" involved. Under Georgia's enactment of the U.C.C., the term required Diamond Crystal to, at its plant, "ship the goods in the manner provided in this article . . . and bear the expense and risk of putting them into the possession of the carrier." O.C.G.A. § 11-2-319(1)(a).

Significantly, Food Movers never argued that Diamond Crystal required delivery by customer pickup.[33] Food Movers's contention that Diamond Crystal required delivery "at the plant" is not to the contrary. Regardless of who paid for shipping, who bore the risk of loss, and when title shifted, the Splenda would be delivered at the plant. Food Movers thus could have paid to have the Splenda shipped outside of Georgia. Instead, Food Movers specified delivery by customer pickup for its own benefit and purposes.

Taking delivery by customer pickup distinguishes this case from ordinary F.O.B. forum cases. Although we have never explicitly reached this holding, we have cited cases that have rejected the argument that an F.O.B. forum delivery term provided sufficient minimum contacts. E.g. Borg-Warner, 786 F.2d at 1059–60 (citing Scullin Steel Co. v. Nat'l Ry. Utilization Corp., 676 F.2d 309 (8th Cir.

---

[33] Food Movers does argue in its reply brief that Diamond Crystal "required delivery or customer pickup at its manufacturing plant in Georgia." Appellant's Reply Br. at 5. But Food Movers's affidavit evidence supports only that Diamond Crystal required delivery "at the plant." Aff. of Thomas Samuel LaMonica, ¶¶ 10–11, May 24, 2007 ("Because of the volume of sweeteners [involved] Mr. Seibel advised me that delivery would be required at the plant.").

41

1982) and <u>Lakeside Bridge & Steel Co. v. Mountain State Constr. Co.</u>, 597 F.2d 596 (7th Cir. 1979)).  An F.O.B. forum delivery term does not necessarily create minimum contacts because it is a formal term relating to title and who bears the risk of loss.  Particularly when the goods are shipped outside of the forum, an F.O.B. delivery term may not be a sufficient indicator of the defendant's purposeful availment of the forum's laws.  But here, Food Movers sought delivery by customer pickup; that is, the Splenda would not be shipped to Food Movers outside of Georgia at all.  The "customer pickup" term indicated that Food Movers intended to affiliate with Georgia and invoke the benefits and protections of its laws.

Food Movers argues that we should ignore this contact because it never took physical delivery of the product in Georgia; its third-party customers did on and for their own account.  It is well established, however, that physical contacts with a forum are not required.  <u>Burger King</u>, 471 U.S. at 476.  Although it never took physical delivery, Food Movers did take and transfer legal title to the Splenda in Georgia.  <u>See</u> <u>supra</u> part IV.  Casting formalism aside, Food Movers saved shipping costs and thus derived an economic benefit by middling the product off of Diamond Crystal's Savannah loading dock.  Thus, Food Movers's simultaneous acceptance of delivery and redelivery at Diamond Crystal's Savannah plant

42

underscores its connection with Georgia.

Alternatively, Food Movers contends that we should disregard its redeliveries because they did not "arise out of or relate to" the transactions at issue. This circuit has not adopted a rigid approach to determining when contacts "arise out of or relate to" a cause of action. See Oldfield v. Pueblo De Bahia Lora, S.A., 558 F.3d 1210, 1222 & n.32 (11th Cir. 2009) (collecting the approaches of other circuits). In a recent torts case, however, we held that the contact must be a "but-for" cause of the alleged tort and that the purposeful contact must be such that the out-of-state resident will have "'fair warning that a particular activity will subject [it] to the jurisdiction of a foreign sovereign . . . .'" Id. at 1223 (alteration in original) (quoting Burger King, 471 U.S. at 472, 105 S. Ct. at 2182).

Even if Food Movers's customers had never picked up the Splenda, Diamond Crystal still would have had a claim for breach of contract. Strictly speaking, therefore, the customer pickup of the Splenda was not a "but-for" cause of Diamond Crystal's claim. Nevertheless, in a breach of contract action, the course of performance is clearly relevant to the "relationship among the defendant, the forum, and the litigation." Helicopteros, 466 U.S. at 414, 104 S. Ct. at 1872 (quoting Shaffer v. Heitner, 433 U.S. 186, 204, 97 S. Ct. 2569, 2579 (1977)). As a result, we have considered a nonresident defendant's contacts with a forum during

43

the course of delivery. Sloss Indus., 488 F.3d at 933 (considering it relevant that the nonresident defendant sent containers into the forum for use in shipping); S & Davis Int'l, 218 F.3d at 1304 (considering the delivery term as a relevant contact); see also Papachristou v. Turbines Inc., 902 F.2d 685, 686–87 (8th Cir. 1990) (en banc) (considering the nonresident defendant's physical entrance into the forum during the course of delivery in the minimum contacts analysis). Likewise, it is appropriate to consider Food Movers's legal, although not physical, acceptance of delivery in Georgia. And because Food Movers's redelivery of the Splenda coincided with its taking delivery, it can fairly be said that the redelivery also "related to" Diamond Crystal's breach of contract claim.

In sum, we conclude that Food Movers purposefully established sufficient minimum contacts with Georgia. Food Movers established a substantial and ongoing relationship with a Georgia manufacturer by engaging in fourteen transactions in six months, each of which involved contacts with Georgia. Food Movers spurred that relationship by sending unsolicited purchase orders to the Georgia manufacturer via the manufacturer's California agent. Each purchase order specified that delivery would be by customer pickup, and Food Movers did in fact allow its third party customers to take delivery of the Splenda in Georgia. Because Food Movers never paid for two of the shipments its customers picked up,

it caused foreseeable injury to the plaintiff in the forum. See Burger King, 471 U.S. at 480, 105 S. Ct. at 2186. For these reasons, Food Movers purposefully established minimum contacts with Georgia and reasonably should have anticipated defending a suit there.

B.

In addition to minimum contacts, the exercise of jurisdiction must also comport with traditional notions of fair play and substantial justice. Burger King, 471 U.S. at 476, 105 S. Ct. at 2184. In this analysis, we look to "'the burden on the defendant,' 'the forum State's interest in adjudicating the dispute,' 'the plaintiff's interest in obtaining convenient and effective relief,' 'the interstate judicial system's interest in obtaining the most efficient resolution of controversies,' and the 'shared interest of the several states in furthering fundamental substantive social policies.'" Id. at 477, 105 S. Ct. at 2184 (quoting World-Wide Volkswagon Corp., 444 U.S. at 292, 100 S. Ct. at 564). We conclude that Food Movers has not presented the requisite "compelling case" that exercising jurisdiction would be unconstitutionally unfair. Id. at 477, 105 S. Ct. at 2185.

In fact, Food Movers does not even attempt to explain why litigating in Georgia would be especially onerous, much less how any such inconvenience achieves a "constitutional magnitude." Id. at 484, 105 S. Ct. at 2188. Instead,

45

Food Movers argues only that in light of Diamond Crystal's connection with California, it would not be "unreasonable" to require suit there. Appellant's Br. at 29. But even if it would be reasonable to require suit in California, Georgia has a "manifest interest in providing effective means of redress for its residents." McGee v. Int'l Life Ins. Co., 355 U.S. 220, 223, 78 S. Ct. 199, 201 (1957). Georgia's interest in exercising jurisdiction would often justify "serious burdens" on a nonresident defendant. S & Davis, 218 F.3d at 1305 (quoting Asahi Metal Indus. Co. v. Superior Court, 480 U.S. 102, 114, 107 S. Ct. 1026, 1033 (1987)). Plainly, it justifies jurisdiction here.

                                        VI.

In sum, we conform this circuit's interpretation of Georgia's long-arm statute to state law as announced by the Georgia Supreme Court. We find that although the district court did not clearly apply the newly-elucidated standard, the exercise of jurisdiction comports with the independent dictates of both the Georgia long-arm statute and the Due Process Clause of the Fourteenth Amendment. Accordingly, the judgement of the district court is AFFIRMED.

SO ORDERED.